THOMAS P. O'BRIEN
United States Attorney
ROBB ADKINS
Assistant United States Attorney
Chief, Santa Ana Branch Office
ANDREW STOLPER (SBN 205462)
Assistant United States Attorney
     Ronald Reagan Federal Building and
     Courthouse
     411 West Fourth Street, Suite 8000
     Santa Ana, California  92701
     Telephone:(714) 338-3536
     Facsimile:(714) 338-3708
     Andrew.Stolper@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>THOMAS BURTON,<br><br>          Defendant. | No. SA CR 08-17-JVS<br><br>**GOVERNMENT'S SENTENCING POSITION; DECLARATION OF ANDREW STOLPER** |

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . .  ii

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . . . .  2

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . .  2

II.  OFFENSE CONDUCT  . . . . . . . . . . . . . . . . . . . .  4

    A.   The Government Learns of Defendant's Laundering
        Business  . . . . . . . . . . . . . . . . . . . . . .  4

    B.   Recordings With Defendant  . . . . . . . . . . . . .  6

        1.   January 5, 2004 Conversation . . . . . . . . .  7

        2.   January 9, 2004 Conversation . . . . . . . .  10

        3.   January 16, 2004 Conversation  . . . . . . .  15

        4    January 20, 2004 Meeting . . . . . . . . . .  16

        5.   February 9, 2004 Meeting . . . . . . . . . .  32

        6.   February 23 and 24, 2004 Conversations . . . .  39

        7.   March 2, 2004 Call . . . . . . . . . . . . .  44

        8.   Early March 2004 Conversation  . . . . . . .  45

        9.   March 11, 2004 Conversation and Transaction  .  48

        10.  Defendant Pressures Rice to Wire the Remaining
            $450,000 to Unicache . . . . . . . . . . . .  50

        11.  The FBI Emerges  . . . . . . . . . . . . . .  50

III. GOVERNMENT'S SENTENCING POSITION . . . . . . . . . . .  56

    A.   PSR's Calculations . . . . . . . . . . . . . . . .  56

        1.   The Amount Laundered is $500,000 . . . . . .  57

        2.   Defendant Used His Legal Skills To Carry Out the
            Offense . . . . . . . . . . . . . . . . . .  58

        3.   Defendant Attempted To Obstruct Justice  . . .  60

        4.   The Government's Guideline Calculation . . . .  62

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

    B.    Appropriate Sentence Under § 3553(a)  . . . . . . .  63

        1.    There Is a Vital Need Here For the Sentence To
            Promote Respect For The Law  . . . . . . . . .  64

        2.    The Sentence Imposed Needs Deter Other
            Attorneys  . . . . . . . . . . . . . . . . . .  66

        3.    There is a Need To Protect The Public From
            Whatever Laundering Structures Defendant Put Into
            Place  . . . . . . . . . . . . . . . . . . . .  67

    C.    Defendant's and Probation's Arugments . . . . . . .  69

        1.    Loss of Defendant's Legal License and Status Is
            Not Punishment . . . . . . . . . . . . . . . .  69

        2.    Defendant's conduct Is Not Aberrant  . . . . .  71

        3.    Defendant's Charitable Works And Support
            Letters Do Support a Low-End Advisory Guideline
            Sentence  . . . . . . . . . . . . . . . . . .  76

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . .  78

DECLARATION OF ANDREW STOLPER . . . . . . . . . . . . . . .  79

**TABLE OF AUTHORITIES**

**CASES:**

United States v. Barton,
     32 F.3d 61 (4th Cir. 1994) .............................. 57

United States v. Bergman,
     416 F. Supp. 496 (S.D.N.Y. 1976) ....................... 70

United States v. Franklin,
     837 F. Supp. 916 (N.D. Ill. 1993) ...................... 60

United States v. Goldman,
     447 F.3d 1094 (8th Cir. 2006) .......................... 59

United States v. Harrington,
     114 F.3d 517 (5th Cir. 1997) ........................... 59

United States v. Hemmingson,
     157 F.3d 347 (5th Cir. 1998) ........................... 59

United States v. Richardson,
     925 F.2d 112 (5th Cir. 1991) ........................... 57

United States v. Terry Christensen,
     SA 05-1046(E)-DSF ...................................... 70

**STATUTES:**

18 U.S.C. § 1956(a)(2) ....................................... 2

18 U.S.C. § 3553(a) ......................................... 63

**SENTENCING GUIDELINES:**

U.S.S.G. § 2B1.1(b)(1)(D)  .................................. 56

U.S.S.G. § 2B1.1(b)(1)(G)  .................................. 62

U.S.S.G. § 2S1.1(a)(2)  ................................. 56, 62

U.S.S.G. § 2S1.1(b)(2)  ................................. 56, 63

U.S.S.G. § 2S1.1(b)(3)  ................................. 56, 63

U.S.S.G. § 3B1.3 ....................................... 58, 63

U.S.S.G. § 3C1.1  .......................................... 63

U.S.S.G. § 3E1.1  ...................................... 56, 63

ii

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

I.    INTRODUCTION

3

Defendant Thomas Burton ("defendant") is an attorney who

4

5

stands convicted of international money laundering in violation of

6

18 U.S.C. § 1956(a)(2).  Defendant's conviction is the result of a

7

guilty plea.  The plea agreement contained no agreement as to what

8

the appropriate sentence should be.

9

Defendant's own words provide the most damning evidence

10

against him and are quoted at length below.[1]  In sum, defendant

11

set up a complex structure that allowed a client, who unbeknownst

12

13

to him was an FBI cooperator, to bring the offshore "proceeds of

14

mail fraud" into the United States without detection by using a

15

series of sham bank accounts and phony transactional documents.

16

Defendant was repeatedly told by the FBI cooperator that he was

17

working in dirty money.  Undeterred, defendant was recorded

18

executing a small ($50,000) transaction and the recorded pushing

19

for a larger one ($450,000).  And when he was told the FBI was

20

investigating, he counseled his client to get rid of the evidence

21

22

as quickly as he could.

23

Attorneys should counsel clients on what the law is and

24

encourage them to follow it.  To facilitate this critical societal

25

goal, communications with attorneys are generally sheltered from

26

discovery by virtue of privilege.  Defendant took advantage of the

27

28

    [1] Defendant's 48-page sentencing position, not including the
311 pages of supporting exhibits, spends less than 2 pages
describing the offense to which defendant stands convicted.

-2-

1   special role he had in society and assisted his client in

2   executing a complex money-laundering scheme designed to hide the

3   proceeds of mail fraud from the United States government.  Money

4   laundering, by its very nature, is a difficult crime to

5   investigate and prosecute.  When it is carried out by an attorney

6   under the veil of attorney-client secrecy, it is nearly

7   impossible.

8

9        Because defendant has declined to cooperate the government

10  will never know the extent of the money laundering activities he

11  engaged over his 30-year "asset protection" career.  Defendant

12  refuses to cooperate, claiming that the government happened to

13  catch him the <u>only</u> time he has ever laundered money.  This claim

14  is belied by the ease and sophistication with which defendant

15  behaved and, as evidenced by the recordings, the fact that he did

16  not show any hesitation or reluctance to counsel his client to

17  break the law and then to obstruct justice.  And even if this

18  Court were to believe that the government caught him the only time

19  he ever laundered money, such an argument is no excuse.  <u>Once</u> is

20  too many times for an attorney to organize and international money

21  laundering scheme and then attempt to conceal it from the FBI once

22  he learns he is under investigation.

23

24       The guidelines call for a sentencing range of 70-87 months.

25  The interests of punishing defendant for his conduct and deterring

26  other lawyers from engaging in illegal activities within the scope

27  of their practices demands a 70-month sentence.

28

## II.   OFFENSE CONDUCT[2]

### A.   The Government Learns of Defendant's Laundering Business

The government investigated, prosecuted, and convicted Daryl Rice ("Rice") and Michael Easton ("Easton") for running a mail fraud scheme called Geneva Healthways ("Geneva").   Geneva was mail fraud scheme where Rice and Easton sent out over 5 million solicitations for a fraudulent home-business.   Geneva received approximately $8 million from over 200,000 people.

Rice had a portion of this proceeds of this mail fraud paid to a British Virgin Islands company called Phoenix Telstar ("Phoenix"), and deposited it in a Barclay's Bermuda account held by that company.   Although this company and account were set up before Rice retained defendant as his attorney, defendant spoke with Rice after the investigation of Rice began about how to keep these funds "safe" from the federal investigation of his mail fraud activities.

On February 12, 2002, Michael Easton ("Easton")[3] proffered to the Postal Inspection Service and the IRS.   Easton was involved

---

[2]The government apologies for the length of this section but believes the Court should understand the scope of defendant's offense conduct before imposing sentence.   The government has excerpted portions of the transcripts of recordings made by Daryl Rice with defendant.   The government has not filed the entirety of these transcripts because they are too voluminous.   If the Court would like to read these transcripts or listen to the tapes that underpin them the government will, of course, make them available.

[3] Easton pleaded guilty to mail fraud on May 6, 2002.   He was sentenced to probation by Judge Stotler on March 4, 2004. The interview memoranda of both Easton and Rice are attached as exhibits A and B to the Declaration of Andrew Stolper.

1 with Daryl Rice's mail fraud scheme.  Mr. Easton told the

2 government:

3

4   When Easton met with Attorney Thomas Burton concerning Perfect Balance, Burton
    suggested a wink trust "like your buddy, Daryl". Easton was told he could establish a

5   trust in which the trustee was located in another country. Burton told Easton it was crazy
    not to have a trust. Burton told Easton he could not be sued for money held in the trust.

6   Burton said there were two types of trust the legitimate one and a "wink trust" like Rice's.
    Burton talked about sending pre-tax money to off shore accounts in Cook Islands,

7   Cayman Islands.

8   The Eastons' set up a trust account for their homes in Irvine and Hawaii. There was no
    money deposited into these accounts. Sheli signed as a trustee on a trust account for

9   Cheryl and Daryl.   Sheli agreed to do it as a favor to Cheryl when Daryl was
    experiencing legal difficulties with Linda Krolop and the Rice's were concerned about

10  exposure of the Point Sur home.

11 Stolper Decl. Ex. A.

12     On September 18, 2003, Daryl Ray Rice ("Rice") proffered to

13 the Postal Inspection Service and the IRS.  In that interview,

14 Rice independently informed provided the same information

15 concerning the "wink" trusts proposed by defendant:

16

17

18

19

20

21

22

23

24

25

26

27

28

13.    About the time RICE and Mike Easton were working on creating a business named, Perfect Balance, Easton introduced RICE to an attorney named Tom Burton ("Burton").  Through various conversations with Burton, RICE began switching his estate planning business to Burton.  RICE has had conversations with Burton about his offshore money in Phoenix Telstar and how to keep it safe in light of the federal investigation.

14.    Rice had Burton review the asset protection documents that Sears prepared.  Burton said that there was no way that he would have done that.

15.    Several times Burton suggested that Rice invest the Phoenix Telstar money in an offshore Internet company named Unicash, as a solution to getting rid of the offshore bank accounts but still having access to the money.

16.    Burton was chief counsel for Unicash.

17.    Burton gave or showed Rice instructions on how to wire the Phoenix Telstar money to a law firm in Bermuda for the purpose of investing in Unicash.

18.    Burton normally didn't give tax advice but he did tell Rice that if he kept the investment offshore then Rice wouldn't have to pay tax on it.  If Rice distributed it to himself there would be tax consequences.

19.    Burton also talked about a "Wink" trust, which was a means of getting money offshore.  Rice wasn't interested.  He didn't know exactly how the "Wink" worked.

Stolper Decl. Ex. B.  According to Rice, defendant told him that the Phoenix money could be wired to a company defendant was associated with called Unicache, which, in turn, could be used to repatriate the money without detection from the federal authorities.

        B.    Recordings With Defendant

        Based on the independent statements of Easton and Rice, the government targeted defendant to determine if the information it received concerning his money laundering, asset concealment, and "wink" trusts was correct.  After Rice pleaded guilty, he

-6-

cooperated with the government and agreed to record his dealings with defendant.  Specifically, Rice was instructed to take up defendant on his Unicache offer as a mechanism to launder the proceeds of the Geneva fraud back into the United States.

       1.   <u>January 5, 2004 Conversation</u>

On January 5, 2004, after exchanging pleasantries, defendant and Rice spoke about how Rice could access his offshore money without being detected.  Rice told defendant that he needs the offshore money for his criminal defense:

> **BURTON**:   So, uh, what's going on?
> **RICE**:     Well I just wanted to get, uh, some input from ya, some ideas on how to access some of that money.  I'm, uh, working hard with my attorneys on my defense and they're telling me defending this case is gonna be like a three hundred thousand dollar, uh, investment.
> **BURTON**:   Uh-huh.
> **RICE**:     And I'm a little bit short in the, in the liquid cash area.  So I just wanted to get some feedback from you on what thoughts and ideas you might have.
> **BURTON**:   Uh, well I don't know if we should, uh, do you wanna come in to do that or do you want to, what you like to ...access that, uh ...

Rice then informs defendant he has concerns about being wiretapped, putting him on notice that there is a potential criminal problem:

> **RICE**:     My attorneys are telling me that I shouldn't worry about my, my home phone, that it's very difficult to, you know, to get wire taps and stuff like that, so they're…
> **BURTON**:   I have no idea about it.

Defendant then noted in the post-9/11 world that repatriating the money without "signals" that the government may pick up may prove difficult:

**BURTON**:   UNT thinking probably UNT I don't know how to  --
under the, that rule after 9-11, I don't know UNT, if you
borrow, if your friend it would be different.
**RICE**:     Uh-hmm.
**BURTON**:   ... or the need to create a paper trail...
**RICE**:     Uh-hmm.
**BURTON**:   in the banking community.
**RICE**:     Uh-hmm.
**BURTON**:   And, uh, I don't know what signals that any kind of
a transaction after all these years.
**RICE**:     Uh-hmm.

Defendant then focused the discussion on Unicache and told Rice if

he provided money to Unicache there would be money available to

"circle back" to the United States so long as they "made it look

like and investment."  Defendant's statements on this call

confirmed Rice's statements to the government concerning

defendant's offer to launder funds.  Defendant pitched Rice on the

structure he eventually pleaded guilty to.  Rice would "invest"

$500,000 into Unicache and then Unicache would take Rice's money

and "loan" it back to him so that it looked like clean Unicache

money instead of dirty Rice money:

1

2

**RICE**:      Is that investment opportunity still there?
**BURTON**:    Yeah, that would UNT.

3

**RICE**:      Hmm.  And would some of that money be available --
if, if we invested?

4

**BURTON**:    To circle back?

5

**RICE**:      Hmm, yeah, something like that.
**BURTON**:    Yes, but there'd be a timing issue.

6

**RICE**:      Uh-hmm.

7

**BURTON**:    UNT exactly how we did that.  How much are you
short?

8

**RICE**:      I, I could probably get by with, uh, a couple
hundred of, of, of the money?  Which, which leaves some other

9

money for investments and stuff.

**BURTON**:    Well, uh, that would be a way to, uh, I think I

10

need to talk UNT to her friend and see what he UNT.  If you
took the roughly five there.

11

**RICE**:       Hmm, that's correct.

12

**BURTON**:    And if we took, uh, uh, if we made it look like UNT
an investment of five [$500,000] and a loan back of two

13

[$200,000] , uh which is net about a hundred UNT three, well,
you know, UNT would he be willing to do that.  That would be

14

UNT from your point of view I think that would be safest.
**RICE**:       I agree.

15

16

If Rice's previously references to the fact the funds were

17

tainted were insufficient, here he tells defendant that the

18

government "would consider this, this money to be the fruits of

19

whatever mail order business I was in before" and that the money

20

was "subject to forfeiture" and should be handled "discreetly as

21

possible."  When defendant is told of the questionable nature of

22

funds, he dryly responds "Okay":

23

24

25

26

27

28

1

2

3

**RICE**:    I just wanted to get, get your full, your full, uh,
uh, options that you think are available to, to, uh, to
access it without, you know, raising, raising red flags and
stuff.  I mean, obviously the, the government, uh, uh, would
consider this, this money to be the fruits of whatever mail
order business I was in before.
**BURTON**:    Um-hmm.
**RICE**:    So I just, my attorneys tell me that my assets are
subject to forfeiture so I just wanna protect things and, uh,
and do things as, as discreetly as possible.  So maybe we
should get together person   and, and just look at all the
options ...
**BURTON**:    Okay.

Defendant then asked if he had Rice's approval to begin looking

into repatriating the assets that were "subject to forfeiture" "as

discreetly as possible" "after 9-11":

**BURTON**:    Okay.  Should I make an exploration?
**RICE**:    Yeah.  Make, yeah, I just wanna give you time to
make an exploration of the feasibility of what we just talked
about.
**BURTON**:    All right.

The two then set up another meeting.

            2.   January 9, 2004 Conversation

     On January 9, 2004, defendant and Rice spoke again.  On this

conversation defendant introduced the use the code names when

describing the contemplated laundering transactions.  The use of

code names, and the fact that defendant is the one requesting

their use, suggest that defendant is both mindful that they were

engaged in illegal activity and that he was determined to avoid

detection:

1

2     **RICE**:       So let's get down to business since we both have
      stuff to do.
3     **BURTON**:     Right.
4     **RICE**:       You had a, a conversation with Wayne [Olson from
      Unicache]?
5     **BURTON**:     Yeah.
      **RICE**:       And ...
6     **BURTON**:     And, uh, he still doesn't know, I'm still doing
      this, uh, all hypothetical.
7     **RICE**:       Right.
8     **BURTON**:     So instead of talking about the, your, your UNT a
      foreign friend, corporate friend, I'm using the code name of
9     Telesis (ph) er, no, ah, Tucson.
      **RICE**:       Tucson?  Okay.
10    **BURTON**:     Tucson.  And, uh, for an individual involved it's
      just Joe.
11    **RICE**:       Okay.  That's fine.
12    **BURTON**:     You're Joe and ...
      **RICE**:       Right.
13    **BURTON**:     ... Phoenix[4] is Tucson.
      **RICE**:       Got it.
14

15    And then defendant proposed the legal structure "totally

16    disappearing" the funds in Phoenix Telstar, now code-named Tucson:

17        **BURTON**:     And, and from your point of view, I think what we
          wanna have is Tucson getting, closing out that [Barclay's]
18        bank account, and not necessarily totally disappearing in the
          legal sense, but for all practical matters, disappearing.
19    **RICE**:       Right.
20    **BURTON**:     Going, going underground.
      **RICE**:       Right.
21    Rice then asks if "going underground" would "be the wink" and

22    defendant explained:

23

24

25

26    _____

27        [4]    As was discussed above, "Phoenix" refers to "Phoenix
      Telstar," an offshore entity defendant previously set up for Rice
28    to collect the proceeds from the Geneva mail fraud scheme.

                                  -11-

**RICE**:     Well, by going underground, would that be the wink or something else?
**BURTON**:   Not exactly a, a wink and we can, we can talk about what that means.  Uh, we could, we could actually make it, we could make the owner of UNICACHE ...well, conceptually, the, the big thing is where the money goes, his money goes to UNICACHE with, with two hundred thousand coming to you.

Defendant then explained the convoluted structure of getting Rice

his fraudulent proceeds back into the United States without being

detected.  As described again defendant, Rice will take the

proceeds of his mail fraud, make a $500,000 investment in

Unicache, and then Unicache will "loan" Rice $200,000.  As

defendant discusses below, they have to invent a plausible reason

for Unicache to make such a loan to Rice:

**BURTON**:   So the Tucson money goes away and then the UNICACHE stock is added the name of Phoenix or is it in some other name as nominee for Phoenix or Tucson, whatever we wanna call UNT.
**RICE**:     Right.
**BURTON**:   And, and, and so, does that, does the corporation still stay right there, same name, or does it change, those are all other variations of a basic theme that you and I can discuss about or, or you can just think on.
**RICE**:     Okay.
**BURTON**:   UNT.
**RICE**:     Okay.  I'll think about it this weekend.
**BURTON**:   That doesn't, yeah, but that, that part doesn't matter.
**RICE**:     Right.
**BURTON**:   The part that matters is either from a UNICACHE point, or from your point of view, what does this transaction look like if it's to happen?
**RICE**:     Right.
**BURTON**:   And because you know, you know certain facts that I don't know.  I know certain facts that you don't know.
**RICE**:     Correct.
**BURTON**:   UNT UNICACHE, and then, of course, I'm the source of the law.
**RICE**:     Right.

-12-

1   **BURTON**:   And if we say -- so let's just use the, the code
2   words of Tucson and Joe -- if, if Tucson dumps its money into
    UNICACHE ...
3   **RICE**:     Right.
    **BURTON**:   ... what's the basis for UNICACHE lending it,
4   because, because Tucson wants -- let's just use the term five
    hundred -- it wants all five hundred as an investment.
5   **RICE**:     Right.
    **BURTON**:   It wants credit, it wants that kind of equity
6   kicker.  It doesn't want three hundred knowing that two
    hundred's gonna go for something else.  It wants, it wants
7   the full bang for its buck.
8   **RICE**:     Right.
    **BURTON**:   So what's the basis for, uh, UNICACHE then lending
9   Joe two hundred grand.
    **RICE**:     Right.
10  **BURTON**:   Cause we wanna separate, we don't wanna loan to
    Tucson, we don't wanna loan to somebody else, we want to be,
11  we wanna separate it from the Tucson you transaction to be
    another party.  Well why, why would UNICACHE -- if somebody's
12  looking at UNICACHE there's, they would say, why would
    UNICACHE make an unsecured loan to Joe for two hundred grand
13  when it needs money, you know, what's that about?
14  **RICE**:     Well maybe it should be -- rather than a loan  --
    maybe it should be a investment in a marketing  agreement.
15  You know how we talked about ...
    **BURTON**:   That, that's the way but I -- see, there's no
16  basis.  See, Wayne doesn't know that Joe has this kind of
    expertise.
17  **RICE**:     Right.
    **BURTON**:   So that's what I was thinking and I, I ran that by,
18  uh, Wayne, you know -- what if it's some kind of a services
    thing that maybe doesn't do the company anything right now
19  but ...
    **RICE**:     Yeah.
20  **BURTON**:   ... but in the future, it does, and so if you, the
21  company expenses this two hundred grand UNT.
    **RICE**:     Well, in fact, I had two hundred thousand dollars
22  worth of, worth of mailing lists that are, that are hot
    prospects for, uh, for a consumer enrolling in the UNICACHE
23  program.
24  **BURTON**:   Well ...
    **RICE**:     That's just an example of what, what type of
25  transaction ...

26

27

28

                                    -13-

Defendant then informed Rice that he wanted a conflict waiver because defendant had some interest in Unicache.[5]  Defendant also stated that once Wayne Olson, the head of Unicache is brought into the fold, that they can stop using the code names.  After this diversion, defendant goes back to describing ways they can "rationalize" Unicache providing Rice $200,000 of his own money:

> **BURTON**:   ... I, I was certain that we could rationalize it with a services, uh, with real services thing and then there's never any loan to pay back.  It, it just makes it -- it made -- that way made it way simpler.
> **RICE**:     Right.
> **BURTON**:   In my mind.
> **RICE**:     Right.
> **BURTON**:   Now the other way that UNT ...
> **RICE**:     UNT.
> **BURTON**:   ... thinking of, the loan way, I was thinking that, uh, that it could be just a requirement that we, we would have to run it by...
> (recording cuts out for approx. 25 seconds)
> **RICE**:     Right.
> **BURTON**:   UNT five and two ...
> **RICE**:     Right.
> **BURTON**:   ... goes to Joe and three sticks with the company. With three can you get live on any kind of a project? Because what he really needs to do -- the, the whole problem has been -- and you've seen this in high tech situations ...

After discussing additional details about Unicache, defendant and Rice agreed to meet on the Martin Luther King, Jr. holiday. This meeting was cancelled in favor a phone call on January 16, 2004.

---

[5]  As will be seen below, defendant consistently pushed Rice to provide funds to Unicache.  It does not appear that defendant told Rice that owned over $800,000 worth of Unicache stock.  PSR ¶¶ 12 and 86.  It appears that defendant was willing to launder $200,000 of Rice's money in exchange for $300,000 going to support his investment in Unicache.

-14-

### 3.  January 16, 2004 Conversation

After a series of misconnects, defendant spoke again to Rice on January 16, 2004.  On this call, Rice made it clear that he needed to make sure that the government did not "grab it when it goes through my accounts" and defendant assured it would not because "it can look as though it's just another Unicache expense" – a "look" that is enhanced because it will be going an attorney-trust account.  Defendant also informs Rice that because it will look like a Unicache expense, Unicache can fraudulently claim it as a deduction on its taxes:

> **BURTON**:   Okay.  So, so here's -- and, and I don't know this but that's what I thought I ought clarify with you that if you're looking to get the two [$200,000] to the lawyers relatively directly, then is the delay an issue, like if it takes a couple of weeks, everything in Bermuda seems to be, seems to take longer.  So that was, that's one thing, a delay in getting the bank account opened.  But the reason that I think ...
> **RICE**:    No, no, I'm not in a big rush, otherwise I would've tried to make the meeting sooner.  It's not that big of a deal, I ...
> **BURTON**:   Okay.
> **RICE**:    ... I have like, like a two month window here.
> **BURTON**:   Okay.  All right.  So, the other side of it is, uh, from the U.S. tax point of view, if -- this is where I think you want it to go through Bermuda -- it's not just the U Company that wants it to go through Bermuda -- I think you also want it to go through Bermuda, because if Bermuda wires the two direct to the lawyers, then it hasn't directly come through you and arguably there's not a U.S., there's not an additional income and so on.  I don't know how you're working with Larry to cover that side of it, but, uh, you know, it's ...
> **RICE**:    Well the two [hundred] thousand would be a write off, uh, whether it comes through me or goes direct or not.  Even though it's going to an attorney's trust account, it's for business purposes.  You follow me?  It's not just personal.

**BURTON**:   Uh, I follow you that it's for business purposes but I ...

**RICE**:      But there is that protection, uh, issue of not wanting the government to, you know, grab it when it goes through my accounts.

**BURTON**:   Well, there's that protection issue but I -- what I was thinking of is if you're not going to be somehow calling all of this, uh, all the five, whatever, that's there, running it through U, uh, U some U.S. entity that known by U's tax returns.  If you're not doing that, then it can look as thought it's just another UNICACHE expense.

**RICE**:      Uh-hmm.

**BURTON**:   UNICACHE has enough lawyers.

**RICE**:      Uh-hmm.

**BURTON**:   So you, so you kind of avoid the reporting issue as well by having it go U, U direct to the lawyers.

**RICE**:      Uh-hmm.

**BURTON**:   So I didn't know whether you were already thinking in those terms or not.

**RICE**:      Well, that's part of our brainstorm, I mean, when we get together, is to look at all the options available, including the wink and when that comes into effect and, uh, you know, all that stuff.

**BURTON**:   Okay.  Well, uh, so is it, uh, it's Tuesday at ten then?

**RICE**:      Tuesday instead of Monday just so I can hang out with my parents a little bit longer.

**BURTON**:   All right.

**RICE**:      All right?

**BURTON**:   Very good Daryl.

**RICE**:      See ya then.

**BURTON**:   Right.

**RICE**:      Bye.

**BURTON**:   Bye.

(End recording)

       4.   <u>January 20, 2004 Meeting</u>

On January 20, 2004, defendant met with Rice at his offices across from John Wayne Airport.  During the conversation Rice, again, put defendant on notice that the funds in question are tainted.  Rice begins the meeting by telling defendant that "I don't think my attorney's want to know where the money comes from"

and wondering aloud if he was going to have to take "a boat out to
Bermuda to bring back a briefcase of cash":

> **BURTON**:   Big picturish stuff, huh?
> **RICE**:    Big picture and my attorney's are, they're telling
> me, you know, after talking about my defense, that the
> government's going to do something, some sort of indictment
> or something.  You know, we've been looking at our defenses
> and, um, I'm still optimistic (UI) say if, if and when that
> happens.  Um, I'm going to need more money and with five
> figure legal fees between my lawyers it just, the money goes
> fast.
> **BURTON**:   Oh, yeah.
> **RICE**:    It's hard for me to come to grips with the fact
> that even though I didn't own those companies, they were
> misleading the public and mail fraud is mail fraud.  Just the
> fact...
> **BURTON**:   And you're just...
> **RICE**:    ...that I participated in the profits, that that's
> enough to indict you because you participated in the profits.
> **BURTON**:   Yeah, that is hard, but that, so they call that
> aiding and abetting or something like that?
>
>     . . .
>
> **RICE**:    I don't think my attorney's want to know where the
> money comes from.
> **BURTON**:   Right, right.
> **RICE**:    I don't know if, you know, I'm going to be, ah,
> taking a boat out to Bermuda to bring back a briefcase of
> cash or how this whole thing is going to work.
> **BURTON**:   Mmmhmm.

Defendant then pushed Unicache as a vehicle where Rice could

"protect" his Phoenix money by repatriating it without "leaving

trails."  Defendant then asks Rice about his "fines" and

"restitution" obligations and tells Rice that defendant "assume[s]

it's all fraudulent":

1

2   **BURTON**:   And then the only issue is the, of your overall
3   allocation of assets, notwithstanding multiple entities, ah,
    owned through a trust that's a foreign trust, that Phoenix is
4   kind of separate from all that.  Nobody knows probably about
    that.
5   **RICE**:   Probably, yeah.
    **BURTON**:   So, you're, ah, so, you, you're, you're probably,
6   and that's, so, I mean that's why everything that you and I
    have been talking about lately was how to access that and how
7   to deal with that.
8   **RICE**:   Protect it.
    **BURTON**:   Protect it. Deal with it.
9   **RICE**:   Yeah.  Access it.
    **BURTON**:   Access it.  So that's one set of, and that's kind
10  of where the whole UNICACHE thing came in because it's both
    an investment a way to access it without leaving trails
11  because of its foreign structure and a way in the future to
    access the returns if it's as successful as, as we think it
12  could be.  So, I mean that's why that seemed to make sense on
    that side.  On the domestic side, the domestic assets, it's
13  largely because you've sold some other assets, so it's
    largely just kind of focused on the house and you don't know,
14  I don't know what the array of options or, or penalties if
    you do, ah, some kind of a guilty plea in a mail fraud thing.
15  Is that going to be a restitution, fines, is it going to be
    time, what, what is it going to be?
16  **RICE**:   Um, all of the above, I mean, I, I don't know so
17  much about the fines but they're looking for restitution,
    whether it gets back, back to the end consumer is another
18  story because you're talking about a lot of little $39, um,
    checks, payments, um, so, but they, they, they look at
19  everything that was taken in by the fraudulent companies and
    they...
20  **BURTON**:   Assume it's all fraudulent.
    **RICE**:   ...and they apply that it's all fraudulent and
21  apply it against all the participants.
    **BURTON**:   Joint and severally?
22  **RICE**:   Joint, joint and severally and if, if I've got the
    assets they go after mine in order, you know, just as much as
23  the others.  Um, so that's, you know, I, I don't, I don't
24  know if they kick people out of their house, you know, and,
    and go that, that far, I mean, I don't know how, how well
25  protected our real estate assets are and so forth.  I mean, I
    sold that office town home and been living off that for the
26  last three years.
    **BURTON**:   Mmmhmm.
27

28

-18-

Rice then asks defendant to think of other ways besides Unicache

that he might be able to launder the funds that defendant

"assume[s]" are "fraudulent" back into the United States.

Defendant recommends that Rice might want to move his funds "to

another jurisdiction":

> **RICE**:     Um, so, you know, you're right.  Phoenix is kind of
> out there and, ah, ah, it's doubtful they even know about it
> and, um, we should explore all the options not just the
> UNICACHE but any, any other ideas you might have.
> **BURTON**:   Mmmhmm.
> **RICE**:     You know.
> **BURTON**:   Well, when we talked about that originally the, or
> not originally, but when we talked about changing that when
> you were concerned about, is that the kind of, BVI? Is that
> what it is?
> **RICE**:     I think the Bahamas.
> **BURTON**:   Bahamas.  Okay.
> **RICE**:     I talked about changing it to another (UI)...
> **BURTON**:   Yeah, and, uh...
> **RICE**:     ...another jurisdiction.
> **BURTON**:   ...another jurisdiction.  And um, we came up with
> the problem (UI) in the restroom right after you, his, his
> office, ah, two offices down here was complaining about a
> check of a little entity that we had four dollar refund check
> on an entity that closed down at the end of the year and he
> can't cash because it's made out to the entity.

Defendant, after having a laugh with Rice, complains about the

"bullshit" associated with "all this Patriot Act stuff," noting

that compliance is tantamount to "saying 'here I am'".:

> **BURTON**:   And, um, you know, I was, I was just saying, you
> know, it's all this Patriot Act stuff.  The bullshit has
> gotten so thick the level of compliance all around the world,
> I think things that we may have talked about in years past
> probably are not available to us now.  In other words, in
> terms of that, other than, you know, leaving sleeping dogs
> lie, ah, anything you do nowadays they're going to want to
> know, they're, they're going to have to follow, all the
> financial institutions are going to have to follow the know-
> your-customer rule.  And so it doesn't matter that the, it's
> a corporation Phoenix Telstar.  It doesn't matter that it's

1  owned by a trust.  They want to know who the beneficiaries in
2  the trust are, who formed the trust, who the beneficiaries of
   the trust are.  They're going to want, um, copies of
3  passports, ah, utility bills, to know that it's a real
   person.
4  **RICE**:     Mmmhmm.
   **BURTON**:   And when you do all that, that's the same as
5  saying, "Here I am."
   **RICE**:     Are you talking about...
6  **BURTON**:   Ultimately.
   **RICE**:     ...when you're opening up a new account like...
7  **BURTON**:   Yeah, and so, so let's say you take it from a
   Bahamas, ah, Barclay Bank...
8  **RICE**:     Yeah.
9  **BURTON**:   ... or something like that wasn't it, ah, just
   sitting there in a money market account or whatever and so
10 you say, "Okay, that yield is too low, we'd rather have it on
   some foreign mutual fund, conservative thing.  You try to
11 open the Phoenix Telstar account and that's what you're going
12 to face.  Anything that you try to do with it, that's what
   you're going to face nowadays.
13
14 Defendant then pushes Unicache again and repeats his concerns
15 about creating a "trail" other than trail that would make it look
16 like an expense of Unicache as opposed to Rice simply sending
17 himself money:

18 **BURTON**:   Tom would have to, I don't know the chapter and
   verse on it, but I know that it, I know that it works and
19 complies.  So, but I mean having said all that, see, the, the
   concept was how can we drain Phoenix's bank account without
20 creating a, a trail necessarily.  I mean there's a trail when
   you wire it, but it's, it's for an investment purpose, so now
21 Phoenix goes from having a cash account to having an
   investment account.  And, and so that was the, that was kind
22 of the way we pieced this thing together, you know, over,
   over the months of talking about it is cash turns into stock
23 and because of the friendly relationship UNICACHE then
   syphons off the 200 grand that you want to go to the lawyer,
24 pays it as a lawyer expense.  UNICACHE has a number of
   different lawyers, whose to know that's not, you know, one of
25 their lawyers.  And, and then maybe it was for a consulting
   agreement with you is why they happen to, you know, direct it
26 to that law firm.  I mean, you know...
27 **RICE**:     Is there a chance that that whole scenario could go
28 awry, they get the $500,000 investment and then the board

-20-

1    looks at this $200,000 expense and say, "Look, what, what the
2    hell is this?"  And then they try and keep the money?
     **BURTON**:    Well, no because the $200,000 expense the way we
3    were talking about it was a, is a marketing expense.  We, we
     don't know, we're, it's the same as we're paying Darryl only
4    instead of paying Darryl...
     **RICE**:    It goes directly to a...
5    **BURTON**:    ...you send it to a lawyer/client trust account.
     **RICE**:    Okay.
6    **BURTON**:    So, I mean it's, it, I think that's a way to cover
     it from UNICACHE's point of view and it's an expense, whether
7    it's an expense that the lawyers expense or whether it's an
     expense for, um, consulting, it's an expense, from the
8    UNICACHE side.  So, from the UNICACHE side I think that it's
     safe.  I don't, I can't see anything that, that you later
9    turn out to be indicted if that happens, um, does that impact
     on UNICACHE or the time UNICACHE deals with you if you're
10   not.
     **RICE**:    Correct.
11   **BURTON**:    So, I don't think that's a, I don't think that's a,
12   a problem.

13
     Defendant explains that if the money is provided to Unicache, Rice
14
     and his wife could also receive disposable ATM cards with $10,000
15
     on them that they could use to access his "Phoenix" money in an
16
     "untraceable" manner:
17

18   **BURTON**:    Yeah, yeah, yeah.  So, um, you know, so, uh, that
     side of it works, where, what, I mean I, you know, in having
19   the months to kind of think about it I haven't thought of any
     problem with that.  The advantage, let's say you do have to
20   do some time, and, and UNICACHE is successful and we've done
     all this, then giving Cheryl some UNICACHE cards so that you
21   can access some of the money, that seems to be a, a clever,
22   ah, attribute of this.  Ah...
     **RICE**:    So you'd be drawing the money out on UNICACHE
23   cards.
     **BURTON**:    Yeah, as opposed to just getting a dividend check
24   or something like that.
     **RICE**:    Right.
25   **BURTON**:    And it's still Phoenix money, so it's kind of like,
     that, that's a thing that would not be traceable.  I think we
26   can juggle that so there's different cards at different times
27   and things like that, um...
     **RICE**:    Is there, is there limits on the cards and stuff
28   like that or...

                                -21-

**BURTON**:   Oh, well, like we say, you know, I, it would have to be, you wouldn't do more than $10,000 on one card...

**RICE**:     I see.

Defendant then says that he thinks that Rice should "wink" and change the foreign jurisdiction of Phoenix to assure the money is not traceable:

**BURTON**:   ...because you wouldn't, you know, in the U.S., um, but, ah, so, what, where I'm hung up and, and, and maybe I should, you know, you, because I know you think about these things, pretty good actually knowing these things too, where I get hung up is what if Phoenix, say if we've got, if we've got a U.S. side and a foreign side...

**RICE**:     Mmmhmm.

**BURTON**:   ...out of the foreign side, what, what if the U.S. people know about this Phoenix entity.  So, what I was, am still trying to, and, and the whole, what we, I said about winking and somehow changing the Phoenix jurisdiction it just never seemed like it was appropriate to do that when there's this cloud over you because to do anything like that for, for professional advisor or anything like that is to become a co-conspirator whether you were to become involved in money laundering or something like, I mean, who knows what that is, you know, what they might allege.  So the only thing that I can think of to kind of hide that, to put, if this is a wall, how can we put another wall to Phoenix and, and if, ah, Phoenix was just a nominee for some other entity.  But still it entails Phoenix having to be in existence, which is what, a thousand a year or something like that.

**RICE**:     Something like that.

To accomplish this, defendant suggested that Rice "do a nominee agreement that says that somebody else really owns it" so "there's no trail":

**BURTON**:   Something, you know, that's, that's what all those things are.  And even if we do a nominee agreement that says that somebody else really owns it, there's no, there's no trail.  The money, the money has been there for what, 5 years, 6 years, whatever, whatever it is...

**RICE**:     The account was opened up in 94.

Defendant and Rice then discuss the security of various Caribbean jurisdictions.  Rice tells defendant that Phoenix is held as

-22-

"bearer shares," which defendant approves of because they are

"hard to track":

> **RICE**:    There was like, uh, I think two in BVI and three in Bahamas or something like that.
> **BURTON**:    Yeah.
> **RICE**:    Phoenix is bearer shares.
> **BURTON**:    Where is Barclays?  Is, is Barclays both places?
> **RICE**:    There all over the world aren't they?
> **BURTON**:    Well, oh yeah, but I mean are they both Barclays accounts?
> **RICE**:    Yes, they are.  Barclays to Barclays.
> **BURTON**:    Barclays to Barclays.  Okay.  And bearer shares I had forgotten that part too, which they're making illegal in a lot of jurisdictions too (UI)
> **RICE**:    I think I read that in the magazine (UI)
> **BURTON**:    Hard to track those.
> **RICE**:    Yeah.  They can't track them right?
> **BURTON**:    Yeah.  So, so they're, they're changing, all those laws phasing out bearer shares everywhere.

Defendant then explains he prefers Bermuda as a jurisdiction

because he thinks "Bahamas has a dirty reputation which means that

it's more subject to be examined.  Uh, for drug, drug money

stuff."  Rice then refocuses the conversation and, again, says

that his "assets are subject to seizure or forfeiture" in short

order:

> **RICE**:    So, considering that my assets are subject to seizure or forfeiture if I get indicted or if I lose the jury trial, um, what, what, put, put the time frame on a return on investment in that three and how safe is, is it.  What, what's the story on that?  Uh, can some of that three be targeted to put on cards.  You know, we talked about a six month.

Defendant then describes that Unicache is not yet up and running

for want of capital, as well as a number of operational

difficulties it has faces.  Defendant then tells Rice that he

spoke with Wayne Olson from Unicache and he is okay with Rice

-23-

"investing" $500,000 with the purpose of receiving $200,000 back

"without telling him why":

> **BURTON**:   Yeah, yeah, banking (UI).  So any one of these can,
> it, it takes so little to get the thing up and with, when you
> surfaced again with this idea of moving this 500 [$500,000]
> but needing 200 [$200,000] of it, I asked Wayne without
> telling him why.  I said, "Could you get it live with 300?"
> He said yeah, doing one of these small deals.  (UI)
> **RICE**:     So, so the 300 would help him do one of these small
> deals.
> **BURTON**:   Yeah, yeah.
> **RICE**:     I see.
> **BURTON**:   So that's, that's his, uh, approach to it.  But,
> you know, how certain is it?  Well, how certain is anything.
> I mean I don't, you know, because I'm in the middle here and
> I don't like this, uh.
> **RICE**:      That's why I wanted you to look outside of the
> UNICACHE thing and give me some ideas if we didn't look at
> UNICACHE.
> **BURTON**:   My problem is I can't, I don't have any ideas...
> **RICE**:      UNICACHE is the best.
> **BURTON**:   ...because of the, UNICACHE is just, it's a hands
> down.  I just don't know anything like it that can meet your
> potential requirements if you're not there and you want to
> way of getting, of getting money to Cheryl [Rice's wife],
> well the cards are a perfect way.  I mean there's, you know,
> it, it takes, uh, a friend-, it's not, if, if, if you had no
> relationship with the company you couldn't do it, but you
> know, it takes with a friendly understanding of what the deal
> is, it's, it's easy to get Cheryl a different card every time
> the one gets close to $10,000, it's, you know, it's easy
> enough to do that when you're (UI)
> **RICE**:     So you don't reload the card, you just get a new
> one.
> **BURTON**:   Yeah, yeah, that's the way we, that's the way we'd
> have to do it, but, you know, other than little things like
> that that are...

Defendant, after further describing how the Unicache ATM cards

would work, again pushes Unicache again stating that other

alternatives might "leave fingerprints" and "raise questions with

all the compliance stuff":

**BURTON**:   It must be.  But I don't have any other ideas
honestly and, and, um, and I have tried to but I just, I
just, uh, it's too unique a situation if you, once you start
touching this you'll leave fingerprints and you raise your,
you raise questions with all the compliance stuff, the, know
your customer type is the, you know.  So...
**RICE**:     So what about the know your customer in Bermuda?
Um, is that going to be an issue?  Or is it (UI)
**BURTON**:   Well, UNICACHE (UI) UNICACHE.
**RICE**:     I see.

Defendant then explains further why Unicache is not yet "live" and

its potential usefulness for internet gaming.  Defendant then

discusses the secrecy advantages of various jurisdictions.  He

then reinforces that $200,000 of the investment will go back to

Rice "as soon as the account is open":

**BURTON**:   And so I don't see, I don't see where any of this
playing around helps.  I mean, the main thing, and there
hasn't been, there hasn't uh, been any, uh, money to open the
Bermuda bank account.  So, what Wayne would do with it is
actually he would, other than the 200 that goes off directly,
I mean as soon as the account's open, that happens.  But he
would only bring in a hundred or whatever is needed
immediately in the states, um, to, you know, to keep, keep
the money there in Bermuda, uh, as long as possible as he, as
he works all these different options.

Defendant and Rice further strategize on how to "wink" Phoenix

away using a "nominee" as the owner instead of Rice:

**BURTON**:   Well, I think you know all there is know about it,
I mean, other than, you know, real specifics of talking with
Wayne, you've been thinking about it for a long time and
you've read the materials.  I know you know about it.  I
think it's really just a question of whether you want to do
it or not.  And in your, in your bigger picture context with
these walls and things, I, I don't know of any way, I wish I
could think of, of some way to make Phoenix disappear but
what's the basis.  See it's too old and seasoned.
**RICE**:     It has to be new to, to wink it or?
**BURTON**:   No, no, no, no, no.  The, but why would Phoenix,
Phoenix with the money, why would it be nominee for some new

1     entity now.  Why would it own, it sends the 500,000.  How,
    how do you?
2     **RICE**:     I was, I was just thinking Phoenix could have a
    nominee instead of being nominee for someone else, Phoenix
3     could have a nominee.
    **BURTON**:    Mmmhmm.
4     **RICE**:     That's what I was thinking.
    **BURTON**:    And keep, keep the UNICACHE shares in someone elses
5     name as nominee for Phoenix.
    **RICE**:     Something like that.
6     **BURTON**:    Now see, I was trying to work it from the other
    way.  That's the power of synergy.
7     **RICE**:     See.
    **BURTON**:    That works.
8     **RICE**:     Okay.  That works, huh?
    **BURTON**:    So that, so that if the world wants to see who owns
9     shares in UNICACHE and it's some other name as nominee for
    Phoenix.  That works.
10     **RICE**:     Certainly isn't Darryl Rice.  He could potentially
    be indicted.
11     **BURTON**:    Right.
    **RICE**:     Because doesn't, if, if, if they file some criminal
12     charges against me doesn't it make it all that easier to
    pierce this whole thing if they have some thing (UI)
13     **BURTON**:    They probably have some powers, but again, to what
    extent if it's, if it's not, this is where the um, the um,
14     protection of the laws really works particularly in British
    law jurisdiction, one of the reasons they went to Bermuda.
15     Because if it's not a violation of the law there, it's not a
    violation of the law.  So, mail fraud in the United States,
16     tax evasion in the United States, any of the things that
    might be a concern, if they're not violations of Bermuda law,
17     they don't care.  And so, but the U.S. is trying to explore
    something when it doesn't relate to a violation of their law,
18     that's, that's where they put up the wall.  So that's the
    power of Bermuda, uh, in a sense, uh, in a very real sense.
19     Same as Switzerland, that's the basic concept.  I'm going to
    make a pit stop again.
20

21

22

23 To make Phoenix disappear, defendant "could supply" "two different

24 entities" that could serve as nominees, one from Hong Kong and the

25 other from Liberia, with a side agreement stating that the "real

26 owner" would be Phoenix:

27

28

1

2      **RICE**:      So, how would it work, who would we go to if he we

3      did it the other way, the nominee thing to...
       **BURTON**:   Um, I could supply, I've got two different entities

4      that I'm the only one that kind of controls that are old and
       seasoned and, uh, out of Hong Kong and uh, you know, just put

5      it in the name of, um, let me see if I can even remember the
       names.  Ultimate Capital Company or Telesis Capital Company

6      and one or the other of those would be the um, the um,
       nominee for Phoenix and we would have a nominee agreement.

7      We, I gave you a form of a nominee agreement and, um, you

8      know, just.
       **RICE**:      These are both in Hong Kong, huh?

9      **BURTON**:   Yeah, they're, they're actually Liberian that's

10     where their offices are,  Price Waterhouse Cooper's takes
       care of, well, they changed that name as of the first of the

11     year so they have some other subsidiary but its basically,
       you know..

12     **RICE**:      Liberia, that's better than Nigeria where they have

13     all these...
       **BURTON**:   Yeah.  Well, but still, you know, the Liberian

14     companies have been (telephone ringing), they were, they
       were, they were one of the old, old, we used to use those a

15     whole lot and now they've kind of changed to Marshall Islands
       as one of those that's, their only whole business is just in

16     being tax shelter corporation (UI)
       (telephone ringing)

17     **RICE**:      So these guys are being signors on the account.

18     **BURTON**:   No, no.
       **RICE**:      No, just...

19     **BURTON**:   No, they would just be the nominee owner.  The, the
       shares in UNICACHE would be issued in the name of Telesis or

20     Ultimate.  And, but, there'd be an agreement that says the
       real owner is Phoenix.

21     **RICE**:      Okay.
       **BURTON**:   And they take, they take the instructions solely

22     from Phoenix.  So you'd still have to keep Phoenix alive.
       **RICE**:      Okay.  Now if we were to put all the money in one

23     spot would you say BVI would be better than the Bahamas?
       **BURTON**:   That would be just my guess.

24     **RICE**:      Your gut feeling.
       **BURTON**:   Yeah.

25

26
       Defendant then tells Rice that he has spoken to Wayne Olson from
27
       Unicache but had not yet revealed his identity.  He also tells
28

                                    -27-

Rice that Olson is fine with a "consulting contract" as a false

basis for Unicache providing Rice $200,000:

> **BURTON**:   Well, he knows that there'd be a, uh, I mean, I've,
> I've just called it Joe in Tucson.
> **RICE**:     Right.
> **BURTON**:   (laughs)  For his purposes and, um, so he knows,
> for example I'm meeting with Joe today and that there may be
> some kind of a consulting contract.  So I don't think he
> necessarily cares what or how that is.
> **RICE**:     You would do the consulting contract then?
> **BURTON**:   Yeah.  I mean, I think it would be a very, um,
> generic one and if you, he, I don't even know if you would
> want to refer to, uh, marketing services.  Or it, it could
> say marketing services and not say mail.
> **RICE**:     Mmmhmm.
> **BURTON**:   For example.  And that could be anything, you know.
> So it could be very generic in that sense but that contract
> probably is with Daryl Rice or is it with some Daryl Rice
> entity.  I mean you certainly have enough of these...
> **RICE**:     Corporations?
> **BURTON**:   ...corporations.

When Rice expresses concerns about the money getting seized,

Burton suggests he use an attorney-trust account as "camouflage"

to reduce the chances of that eventuality:

> **RICE**:     I just don't think we want that money going through
> my corporations because it could get pounced on.
> **BURTON**:   No. (UI)
> **RICE**:     (UI) coming from Bermuda.
> **BURTON**:   Right.  But I think the requirement again is that
> it go direct to the law firm.
> **RICE**:     Right.
> **BURTON**:   I think that's what you're, I think that's what
> you're saying.
> **RICE**:     Right.
> **BURTON**:   You've got, that's, that's where it's going to go
> anyway, then you may as well because that's camouflage from
> the, I mean it could be for...
> **RICE**:     From the, from the law firm practically.
> **BURTON**:   (UI)  That's right.
> **RICE**:     So would it, if, if the money goes to the, um,
> Bermuda law firm would the money then go, before it even hits
> the UNICACHE bank account, would it go directly to...

1      **BURTON**:   I think it needs to go into the UNICACHE bank

2     account.

3 Defendant goes onto state that Rice should do the transaction soon

4 because Unicache is hurting for money and, as a result, is willing

5 to do "creative things."  Defendant then provided Rice Wayne

6 Olson's phone number.  Rice explains that the corporation of his

7 that will be the counterparty to the fake Unicache consulting

8 agreement will be "Vitality" and Burton explains that the

9 transaction can happen now even though Rice's defense lawyers

10

11 don't yet need the money:

12      **BURTON**:   Uh, International Inc.  UNICACHE International LLC.
    And 200,000 instead of going to Vitality gets wired to a

13     client of trust fund account.  And you can say, even  though
    you don't owe the lawyer the money now...

14     **RICE**:     Mmmhmm.
    **BURTON**:   You can say, "I'm, I'm going to put this in not for

15     you to bill against, not to anything, I just, I'm, I'm going
    to have wired in.

16     **RICE**:     Mmmhmm.

17     **BURTON**:   So, we need the wire instructions for that.
    **RICE**:     Mmmhmm.

18     **BURTON**:   So that's the payment for this contract, so Wayne
    wouldn't even know you're in that context.  Wayne would just

19     know whoever signs that wouldn't know your name necessarily
    unless you happen to be the signor for Vitality.

20     **RICE**:     Mmmhmm.

21     **BURTON**:   Then, the nomin-nominee, if we use one of those
    company names is, is the nominee for Phoenix...

22     **RICE**:     Mmmhmm.
    **BURTON**:   ...and then, I think, you've, we've done things

23     like this before I had Jeannie just print something out of
    disclosure and waiver of conflict of interest.  But this is

24     the only place that theoretically all names have to come
    together...

25     **RICE**:     Mmmhmm.

26 Rice then notes that this type of waiver was also needed with

27 Michael Easton:

28

1
2
3
4
5

**BURTON**:   ... cause I've done, you know, I would be
facilitating and I don't want somebody later to say, "Oh, you
should have disclosed da-da-da-da-da, so I think you've seen
that.
**RICE**:      I think we did that with, with Easton's, um,
balance.
**BURTON**:   I...yeah, yeah, yeah.

6
7

After discussing the convoluted ownership of Vitality, defendant
explains the advantage of using a nominee for Phoenix:

8
9
10
11
12
13
14
15
16

**RICE**:      Well, like these, these officers for Phoenix.  This
is actually what the wink is, right?  Getting someone else to
be the nominee?  (UI)
**BURTON**:   Yeah, but you're familiar with the nominee
agreement.  All that says is that, uh, who's the, who's the
owner but it, it, that, that piece of paper says the real
owner is Phoenix so, uh...
**RICE**:      That's what I'm thinking maybe these guys would be
signing on that, I wouldn't.
**BURTON**:   Well, no, because you're, because I'm preparing the
nominee agreement and, you know, you're...So that's the thing
is like what am I doing.  Every bodies, you know, it's really
you and Wayne, you know.
**RICE**:      Mmmhmm.

17
18

Defendant then assures Rice that Wayne does not need to know all
the intricacies of Phoenix's ownership:

19
20
21
22
23
24
25
26
27
28

**BURTON**:   So, I mean, that's why, yeah, you and Wayne.  It,
it's nice if you and Wayne actually do the deal.  But Wayne
doesn't know your and you don't want Wayne to know your part
of the deal.  You don't, in a sense you don't want Wayne to
know that Telesis is the nominee for Phoenix.  You just as
soon that he doesn't even know the Phoenix name.  (tapping
noise)  Probably.  (Pause).  So I don't know what's going on
in your head in terms of, um, decision making but I think
we've talked through the mechanics, the elements of it.  The,
they're some things that I, I need to know from Wayne, like
the status of the Bermuda bank account and talk with the
Bermuda, the people in terms of, uh, whether it goes to the
law firm.  You need the client trust fund information there,
but this, these, this nominee agreement, if that's the way
you want to do it, I have to have an, an instruction.  I'd
essentially give you a termination of nominee agreement at
the same time that's signed by me as the attorney in fact for

Telesis, turning it back to whom ever you wish to have it go
to, you know, the, uh,

Rice then summarizes the deal to defendant:

    **RICE**:    Well, what, what was going through my head is, um,
is you put, step one would be put the money from Bahamas to
BVI so it's in one place.  Step two would be setting this
nominee thing up.  Uh, step three could, could potentially be
a direct wire from BVI to the attorney's trust.  Right?
    **BURTON**:    Mmmhmm.  And one and two happens simultaneously
too, I mean there's no reason we can't...
    **RICE**:    Yeah.
    **BURTON**:    ...if we can create the nominee agreement
instantly, I don't know who signs on behalf of Phoenix.  But,
um...
    **RICE**:    It would be me.
    **BURTON**:    Okay.
    **RICE**:    That avoids this conflict and to get the two
hundred to my attorney doesn't it?  If it goes directly from
this newly nominated Phoenix directly to the attorneys
account or does it risk getting Phoe...
    **BURTON**:    Going directly from Phoenix.
    **RICE**:    Yeah.
    **BURTON**:    Okay.  So then there's the $300,000 investment in
UNICACHE so you keep UNICACHE out of that...
    **RICE**:    Out of that $200,000 thing.
    **BURTON**:    Mmmhmm.

Rice then says that this direct wire between Phoenix and his

attorney's trust account is not a good idea because they will find

out these "funds are the "proceeds from the mail enterprise."

Defendant then suggests that Unicache, and not Phoenix, wire the

money to Rice's attorney's trust account:

    **RICE**:    But, you know, our first brainstorming was, well...
    **BURTON**:    But, but it's coming from, uh. it's coming from a,
um...
    **RICE**:    It's not coming from a lawyers account, it's coming
from...
    **BURTON**:    ...from the Phoenix account.  And that...
    **RICE**:    Right.
    **BURTON**:    ...that leaves the direct connection between
Phoenix and the lawyer.
    **RICE**:    Yeah, the lawyers aren't gonna...

**BURTON**:   I don't think you like that.
**RICE**:     Well, the lawyers sure aren't going to like it if they know about it, if they find out about the proceeds from the mail enterprise, um, went to Phoenix and then all of a sudden they got this $200,000 from Phoenix.  Paul Meyers is pretty conservative.  He's my lead lawyer.
**BURTON**:   Mmmhmm.  Yeah, I think you want it to go to UNICACHE.  (UI)

Defendant and Rice then discuss some other possibilities and

defendant recommends the following structure geared to avoid

detection by the United States:

**BURTON**:   Hmm.  (long pause)  So, I think this is it.  If we move Bahama money to BVI, we have a nominee agreement.  We move BVI money to Bermuda not knowing the question the, the questions here are attorney client trust or new account.  UNICACHE issues share certificates to the nominee.  There's the consulting contract that's entered into and that's whatever your entity is with UNICACHE International LLC and then UNICACHE wires the consulting money to the attorney/client account and then it's basically to operate.  I mean that's, so this, this does the investment and papers the, uh, steps and then it's basically just, uh, operate.
**RICE**:     Operate UNICACHE.

Defendant then asks Rice for additional information about Unicache

and they joke about the codenames that they have been using and

they agree that they should speak with Wayne together.

        5.   February 9, 2004 Meeting

On February 9, 2004, defendant met with Rice again at his

offices.  First they met together to discuss an upcoming call with

Wayne Olson from Unicache.  Defendant briefed Rice on what he has

already told Olson:

| | |
|---|---|
| 1 | **BURTON**:    UNT Phoenix.  And, uh, he doesn't know -- he knows |
| 2 | there's a legal situation that could be criminal but I |
| | haven't told him what and why and how and any of that stuff. |
| 3 | Uh, and I think that he doesn't think -- because -- that, |
| | that it's relevant -- because he's just dealing with Tucson, |
| 4 | you know.  I mean, that's the way he's looking at it and, |
| 5 | and, oh by the way, there's this guy -- now he, I've said |
| | there would be either a consulting arrangement or this UNT |
| 6 | direct payment. |
| | **RICE**:    That's what I wanted to clarify -- is how that UNT. |
| 7 | **BURTON**:    He's not, he's not, uh, you know, these things |
| | organically evolve and, and the idea originally was a, a |
| 8 | consulting, uh, fee, so it could be ... |
| 9 | **RICE**:    Well, there was a loan, then it evolved UNT. |
| | **BURTON**:    UNT loan to a ... |
| 10 | **RICE**:    Uhm. |
| | **BURTON**:    ...and so he's comfortable with that because, you |
| 11 | know, a lot of times you pay people.  I mean, his history has |
| | been ... |
| 12 | **RICE**:    Paying lawyers and ... |
| | **BURTON**:    ... yeah, paying people and not necessarily getting |
| 13 | anything for it.  So that part, you know, I mean, he's, he's |
| | really looking at the whole ... |
| 14 | **RICE**:    Uh-hmm. |
| 15 | **BURTON**:    ... five hundred thousand as a net, three hundred |
| | thousand investment, the way it works out.  But other than |
| 16 | that, I don't think he has any concerns and I don't think he |
| | needs to.  I mean, depending on whether the, the real |
| 17 | consulting -- which I think is an interest of yours -- and I |
| | think it should be, uh, if he knew, but I haven't, I haven't |
| 18 | said, hey this is ... |
| 19 | **RICE**:    Yeah, I mean ... |
| | **BURTON**:    ... Joe is the Daryl guy that has direct mail |
| 20 | marketing ... |
| | **RICE**:    ... I, yeah, I mean, I'm prepared to tell him about |
| 21 | the Capital Credit situation, how we were charging an up |
| 22 | front thirty nine dollar fee for this, uh, catalog card and |
| | then, uh, uh, it ended up after we built it up to where it |
| 23 | was generating, you know, four million dollars a month.  We |
| | just had some legal troubles with those misleading aspect of |
| 24 | the sales material and, you know, we were raided by the |
| 25 | government and, uh, my legal situation escalated when they |
| | started looking at all my other business opportunity type |
| 26 | mailer thing and just go into my history a little bit so it's |
| | out in the open, he knows about it.  I just don't know how |
| 27 | much ... |
| | **BURTON**:    Yeah. |
| 28 | **RICE**:    ... of that I need to, should do or shouldn't do. |
| | **BURTON**:    You know, I UNT. |

1
     **RICE**:     Or if it's important or ...

2
     **BURTON**:   I don't think -- if he wants to go into it ...
     **RICE**:     Uh-hmm.

3
     **BURTON**:   ... uh, then fine.  I'm betting he won't.  I'm
     betting he won't ask.

4

They then get Olson on the phone.  After discussing a number of

5

aspects about Unicache's business, Rice confirms the deal with

6

7
Olson and defendant.  Defendant again confirms that the $200,000

8
payment is a sham:

9
     **RICE**:     Uh-hmm.  Well, Tom has, uh, told you a little bit

10
     about how this transaction would take place, especially
     because of my situation with this, you know, with this

11
     criminal investigation against me ...
     **OLSON**:    Uh-huh.

12
     **RICE**:     ... uh, how, uh, my foreign entity, uh, which we
     referred to as Tucon ...

13
     **BURTON**:   Tucson.  Tucson.

14
     **RICE**:     Tucson, I guess, would, would then, would transfer
     money to, uh, to your law firm in Bermuda.  That's how it was

15
     originally.  And then, uh ...
     **OLSON**:    Tom, I got the stuff from, from, I think

16
     everything's done at the bank.
     **BURTON**:   Okay.  So the bank account is ...

17
     **OLSON**:    I got a confirmation from what's her name, Carla, I
     got a, I got a, yeah.

18
     **BURTON**:   Okay.

19
     **RICE**:     So you've got a bank account now?
     **OLSON**:    At, uh ...

20
     **RICE**:     Over in Bermuda?
     **OLSON**:    Yeah.

21
     **RICE**:     Okay.  Uh, so this, this, this transfer of my five
     hundred thousand would go to your, your location in Bermuda

22
     ...
     **OLSON**:    Uh-hmm.

23
     **RICE**:     And then, uh, once that's all cleared then we'd do

24
     a two hundred thousand dollar transfer to my, uh, my
     attorney's, uh, my criminal attorney's, uh, trust account

25
     here in, here in, uh, Santa Ana.
     **OLSON**:    All right.

26
     **RICE**:     California.

27
     **BURTON**:   And that would be by way, the way we've talked
     about doing that, to refresh Wayne's recollection, cause he

28
     and I haven't talked about this for a couple of weeks, is
     that would be the equivalent of a wire transfer of a two

-34-

hundred thousand advance payment on a consulting fee to some, one of your domestic entities.  Uh, that could be along the lines of what we're talking about now but it's not really -- I, I think what we're thinking is, or what Wayne and I are thinking is that that's as an accommodation to you and it's not necessarily, I mean, we realize you're not gonna get any money out of that to really do a direct mail campaign or anything like that, but I think that we can probably say to you that we won't do any direct to consumer direct mail marketing things without talking with you first about it. And we can probably also say something along the lines of when Wayne has cash flow and you need money to, to put the pieces together to actually do the initial twenty five thousand or whatever mailings, we're glad to support you in doing that but he has this, these other priorities of getting the company live first.  Is that fair to say Wayne?
**OLSON**:     Yes.  But I think that, uh, unless I missed something in there Tom, I think that, that we could get his thing -- start getting his thing situated right away.

And in case defendant was not clear enough, he again confirms that Unicache "wasn't really getting anything" for the $200,000 it was going to "pay" to Rice:

**BURTON**:    And, and what I was trying to say, the reason I was saying is, with the two hundred thousand UNICACHE wasn't really getting anything.
**OLSON**:     Well no, for that two hundred there's nothing in there, right.

Defendant, Rice and Olson then go over the structure of the transaction.  Defendant assures defendant that the funds do not have to "go through New York" – an important point for defendant because he states – in no uncertain terms – that the funds are "proceeds of my mail fraud activities, to be honest":

**BURTON**:    The Ber-, the Butter, Bank of Butterfield is the oldest and largest bank in Bermuda that's where our, where the UNICACHE bank account, newly established.  And if it's going from, you know, another Caribbean island to Bermuda, I don't think it has to go through New York.
**RICE**:     Yeah.  Cause I was concerned about the government, uh, intercepting it and seizing it because it was proceeds of

-35-

1    my mail fraud activities, to be honest, I, I was just really
     concerned about that whole thing.
2    **OLSON**:    I, I think what we need to do, my, uh, my
     understanding is that as long as it's not going, it, it
3    wouldn't touch the U.S. till, till it came from our bank back
     in.  But I wanna be able to confirm that.  Uh, I, I'm not,
4    you know, I, I don't know that to be true.  I know that --
     let me rephrase it -- when I was in the Caribbean when I sent
5    money anywhere but to the United States, I didn't go into the
     U.S.
6    **RICE**:    Okay.
     **OLSON**:    I went from the Caribbean to London or to, you
7    know, it went to London or someplace like that to go on, but
     most cases it went either to Lloyds or Butterfield and then
8    they sent it wherever the hell it was going.
     **RICE**:    Okay.
9    **OLSON**:    In the case of the, uh, in Antigua it all went to
     Lloyds.  Everything I put on it went to Lloyds.
10   **RICE**:    When I was analyzing that, uh, that sheet, I
     assumed if it was U.S. dollars it would have to go through a
11   U.S. bank, if it was Canadian dollars it would have to go
     through a Canadian bank but it that's not the case, then that
12   would, that would make the transaction a little bit safer.
13
14   Defendant attempts to un-ring the bell that Rice rang by stating

15   the funds were the proceeds of mail fraud, confirming that

16   defendant heard and understood exactly what Rice said:

17
     **BURTON**:    And the other, the other point of clarification,
18   Wayne, is that Daryl is under investigation but not -- he
     doesn't have any particular problem that he's aware of right
19   now, and he has no reason to believe that the foreign
     entities are connected with him.
20   **OLSON**:    Uh-hmm.
     **BURTON**:    Uh, at this point in time.  So we -- is that fair…
21
22
23   Rice counters defendant "putting it all on the table":

24
     **RICE**:    ... from this, from this investment in UNICACHE. I,
25   I just, you know, wanted to let you know of my interest in,
     in marketing this.  Uh, you know, I've been under
26   investigation now since, uh, the year 2000.  Maybe they've
     been investigating me further back, but, uh, you know, I need
27   this two hundred thousand dollars in my lawyer's accounts
     because I'm afraid that, uh, that I could be indicted for all
28   this investigation and the, the, the clients of mine linking

                                -36-

1    me to their businesses, and you know, so I'm, I'm just being,
     I'm just putting it all on the table with you that ...
2    **OLSON**:     Well I think you need -- yeah, you wanna make sure
     you got the cash there.
3    **RICE**:     I wanna make sure the cash gets to the lawyers, uh
     ...
4    **OLSON**:    Right.
5    **RICE**:     ... accounts.  If it goes through my account then,
     uh, it may never get to the lawyer's accounts.  I mean, I
6    haven't had that, I haven't had them seize any of my personal
     accounts yet.  Back in 2000 they, they had half a million
7    dollars of mine on hold for a couple of weeks but then it was
     released when they, uh, went through all the documents, UNT
8    during the raid and saw that I wasn't as involved as they
     thought I was.
9    **OLSON**:    Uh-huh.
10   **RICE**:     But, uh ...
     **OLSON**:    Well, I think that what we should -- here's my,
11   here's where I'm at Tom, it's pret-, you know how I'm pretty
     basic.  I think we need to establish  -- it's coming out of
12   the BVI and going?
     **RICE**:     Well I have it in two places.  I have it in Bahamas
13   and I have it in BVI and I, I, in my last discussion with Tom
     we discussed moving, moving the money in the Bahamas over to
14   BVI because the banks over in Bahamas are getting really, you
     know, they're wanting all this extra documentation and
15   wanting you to sign something regarding tax issues with your
     money and, you know, they, they wanted us to actually close
16   the account.  So I thought to avoid any problems that
     transferring it from, uh, Bahamas to BVI being the entity
17   with the same name, would not be any problem at all, it would
     make the Bahamas bank happy that we're closing that account
18   and then everything would be in one place to where we could
     transfer it over to, uh, ...
19   **BURTON**:   Over to BVI to ...
     **RICE**:     ... UNT investment.
20   **BURTON**:   ... Bermuda.
     **RICE**:     So it'd be from BVI to Bermuda.
21   **OLSON**:    Well I think what, uh ...
     **RICE**;    It, it's about half and half right now.  I got half
22   of it in one place, half of it in, in another place.

23   After further discussion about the mechanics of the laundering,

24   Rice tells defendant that he "knew that there were claims being

25   made that weren't true, and because I was not just getting a, uh,

26   a per unit thing, but I was also getting a percentage of the

                            -37-

profits, uh whether I owned those companies or not, which I

didn't, I'm still linked to 'em and, you know, that, that, that's

why I'm facing this, this serious legal situation right now."

This admission further admission deterred neither defendant nor

Olson.  Defendant went onto assure Rice that if he used entities

"outside the investigation" he would be okay.  Rice then tells

defendant and Olson, that he is actually "guilty of mail fraud."

Like his previous admissions, defendant and Olson didn't slow

down:

> **RICE**:     For that matter, they might know about me being off
> shore and even they might be watching those off shore
> accounts so that's, that's why we're concerned.  You know,
> when you're in a position where, uh, where you're, you're
> guilty of mail fraud, you have to just, you know, when, when,
> when they're watching your every move, you have to make sure
> everything you do is clean.
> **OLSON**:    But these, these off shore accounts are ten years
> old or so?
> **RICE**:     Yeah, they were set up back in '94.
> **OLSON**:    Yeah, yeah.  Okay.  Uh ...
> **RICE**:     Okay.
> **OLSON**:    Why don't we do that Tom?  You give me a call.
> **BURTON**:   All right.  Good enough Wayne.
> **OLSON**:    Daryl, I'll be back with you -- might be tomorrow.
> Okay?
> **RICE**:     That, that's fine.  I'm in no hurry.
> **OLSON**:    All right.
> **RICE**:     Thanks.
> **OLSON**:    Thank you.
> **RICE**:     Bye Wayne.
> **OLSON**:    Bye bye.

After Olson got off the phone Rice reconfirmed - for a third time

- that defendant understood he was helping conceal the proceeds of

fraud.  This time defendant states that he understands "there's no

question that there is mail fraud":

1   **RICE**:      Uh-huh.  You think I was clear enough with Wayne
2   about my, uh, mail fraud issues and the ...
    **BURTON**:    Oh you were great, great.
3   **RICE**:      Cause I don't wanna mislead him into thinking that,
    uh, I don't have issues.
4   **BURTON**:    I guess, I guess ...
    **RICE**:      But I'm guessing he must have guessed I had issues
5   cause I wanted it done this way.
    **BURTON**:    Yeah.
6   **RICE**:      Uh-hmm.
    **BURTON**:    Yeah.  No, I think you were very direct about that
7   and I guess I just, I guess you're saying like there's no
    question that there is mail fraud.
8   **RICE**:      No.
9   **BURTON**:    And, and I know that if you're worried about going
    to jail there has to be something that would constitute it.
10  But you just don't know whether -- if and when it's gonna,
    there's gonna be an indictment, if it's gonna be actionable.
11  **RICE**:      It's really, yeah, I mean, it's really, am I gonna
12  be indicted or am I gonna, uh, enter a plea agreement.  It's,
    it's one of those two things and I just, you know, my
13  attorney's are saying ...
    **BURTON**:    But one of those two things will happen?
14  **RICE**:      Yeah.  It's just very ...
    **BURTON**:    Just a matter of time, huh?
15  **RICE**:      ... it's just a very serious situation.  I mean,
16  and Wayne starts talking about me running a company with 40
    employees, I, I, I ...
17  **BURTON**:    Oh, I don't think he was talking about -- that's
    why I was trying to clarify ...
18  **RICE**:      Yeah.

19          6.  February 23 and 24, 2004 Conversations

20      By this time, defendant and Rice were attempting to work
21
    through the logistics of the laundering with bankers in the
22
    Caribbean.  Rice continued to express concerns about the Phoenix
23
24  money coming directly to him and requested defendant provide more

25  of a buffer.  Defendant assured Rice that because Phoenix was more

26  than 10-years old "it's probably not on any lists or anything like

27  that":

28

**BURTON**:    And, that, they have the potentiality, we don't
know whether it's real or not.  We do know over a 5 percent
is real in terms of Bermuda Monetary Authority.  But the,
they supposedly, or they theoretically do diligence on just
about any entity so they will, so the advantage that Phoenix
has is that it's ten years old and it's probably not on any
lists or anything like that and, ah, so reporting it that way
as opposed to taking a new entity name then they're going to
ask whose the owner of it, they're going to, they, they drill
down, they get, get to that level of granularity in terms of
knowing your customer rules.  Plus, to really protect you, so
in other words I guess what I think that I'm saying is from
the safety stand point of Unicache, ah, doing it exactly the
way it is is the best, is the best way because...
**RICE**:    I'm just afraid that Phoenix Telstar might be on
some list and if the source of funds for the new entity came
from a foreign source that would, you know, rather than a
U.S. source, that would, ah, be an extra buffer.
**BURTON**:    Well, but if, but you see if, if they ask, if what,
whoever, wherever it is that we would go to do a new entity
asks, they, they...  It's, there's still going to be a
Phoenix, ah, trail to whatever the new entity may be.  I'm
not saying don't.
**RICE**:    Right.  It would just be foreign to foreign.
That's all.
**BURTON**:    Yeah, yeah.

And if it wasn't already clear, defendant then confirmed that he

had no reservations about the transactions:

**BURTON**:    A lot of things to think about, ah, but, ah, I, I
don't, ah, yeah you, you basically you have to direct me.  I,
I'm game to do anything.

On February 24, 2004, defendant and Rice placed a call to Carol

Donelan, a banker who according to defendant worked at Antigua

Overseas Bank.  Defendant then proposed a list of three names of

nominee companies to the banker to see if they were acceptable as

a vehicle to disguise the fact that Rice was the owner of the

Phoenix account:

-40-

1   **BURTON**:    Hi Carol.  Tom Burton and I have you on the speaker
    phone with Daryl Rice.  Daryl meet Carol Donelan.
2   **RICE**:      Hi Carol, this is Daryl.
    **CAROL**:     Hi Daryl.  How are you?
3   **RICE**:      Good.
4   **BURTON**:    Daryl, uh, gave me a list of three different
    alternative names, uh, and I thought maybe it, knowing that
5   it's getting late down there, calling them to you might be
    easier than faxing.
6   **CAROL**:     Okay, no problem at all.
7   **BURTON**:    Uh, first is -- and there's no order of priorities
    so I'm saying first, but that's only because it's first on
8   the list ...
    **CAROL**:     Okay.
9   **BURTON**:    Cambria, C-a-m-b-r-i-a.
    **CAROL**:     Uh-huh.
10  **BURTON**:    Industries, plural.
    **CAROL**:     Uh-huh.
11  **BURTON**:    LTD.
12  **CAROL**:     Okay.
    **BURTON**:    Next is Leonardo Phillips.
13  **CAROL**:     Uh-huh.
    **BURTON**:    LTD.
14  **CAROL**:     L-e-o-n-a-r-d-o?
    **BURTON**:    Correct.
15  **CAROL**:     Phillips is one or two l's?
    **BURTON**:    Two l's.
16  **RICE**:      Two l's, plural.
17  **CAROL**:     Okay.  LTD.
    **BURTON**:    And the last is Global Tech.
18  **CAROL**:     Give me one second, I'll be right with you.
    **BURTON**:    Thank you.  The normal process like anywhere else
19  is they have to call the, the government clerk UNT.
20  **RICE**:      Or check the website.
    **BURTON**:    Well I don't know, is there a website?
21  **RICE**:      I don't know, I didn't check but most, a lot of
    jurisdictions, a lot of jurisdictions have websites, I think.
22  **BURTON**:    Okay, UNT.  The bank is pretty high tech there but
    the government normally is not.
23  **RICE**:      Does she work for the bank?
24  **BURTON**:    Yeah.
    **RICE**:      Okay.
25  **BURTON**:    But they have a ...
    **CAROL**:     Sorry about that.
26  **BURTON**:    No problem.
    **CAROL**:     The last one is Global Tech?
27  **BURTON**:    Yes.
    **CAROL**:     Two words?
28  **BURTON**:    Uh, two words, yes.

                              -41-

1      **CAROL**:    T-e-c-h?

2      **BURTON**:  Correct.

       **CAROL**:    Okay.

3      **BURTON**:  Also an LTD.

       **CAROL**:    Okay, thanks.  Okay, I can almost guarantee Global

4      Tech will not be acceptable, acceptable cause I'm sure I've
seen that before.

5      **BURTON**:  Oh, okay.

       **CAROL**:    But we'll go ahead and see what we come up with.

6      **BURTON**:  The other, the other two are, are fairly different.

       **CAROL**:    Yeah.

7      **BURTON**:  And, uh, we're just, Daryl just got here.  He was

8      running a little late so I thought we'd, we'd do that first.
I did get the two documents so we'll work on being ready on

9      those and then do our, our other stuff.  Uh, just, uh, Daryl,
for your sake, uh, I, I told Carol that we are interested in

10    moving some money from the two existing accounts, that are
old accounts with this, uh, uh, the old corporation, uh, as

11    soon as possible.  Until she knows the name and knows that
we, via fax, that documents are headed her way, she can't get

12    the corporation UNT.  She can assign a corporate number to it

13    as soon as she knows things are on her way and what name it
is.  So once we have the number, then we can work on the

14    wire.  You can, you would probably give me a fax or an email
with the specific wire instructions.

15     **CAROL**:    Yes, definitely.

16    **BURTON**:  But, uh, then we can get the wires going.  As I
mentioned to you Carol, the existing company has accounts in

17    -- is it BVI in the Bahamas, I think?

       **RICE**:     Correct.

18

19  Defendant then confirms that the transaction is "roughly a five

20  hundred thousand dollar" one.  In addition, the banker confirms

21  that he has another transaction with defendant "on the other

22  matter we discussed previously:

23    **BURTON**:  Yeah.  So, uh, there's, uh, it's roughly a five

24    hundred thousand dollar transaction.

       **CAROL**:    Okay.

25    **BURTON**:  Okey doke.

       **CAROL**:    No problem, and Tom, and I sent you another email

26    on the matter we discussed previously so you can just have a
look at that.

27

28

After a further conversation with Olson, defendant and Rice call

Donelan back.  The banker advises them that if they put $500,000

in the account and then immediately wire out $200,000 it will

raise red flags:

> **CAROL**:   It makes it easier in that then the account is
> already set up, once the wire comes in and we know exactly
> where to send it, it's slightly easier because then once the
> funds come in there's no question UNT to open the account,
> blah, blah, blah, this and that, and you're, I guess you have
> the security of knowing the account's already open.
> **BURTON**:   And, and as we ...
> **CAROL**:   UNT.
> **BURTON**:   ... told you, the, the whole purpose of this is
> it's about to make an investment so the fees will, the monies
> will come in and out so the five thousand dollars is
> something that could stay then.
> **CAROL**:   Yeah, uh, again, remember we don't accept pass
> through transactions, so those fees can't just come in and go
> straight out as a whole.
> **BURTON**:   The fees can't?
> **CAROL**:   No, the, the actual amount, what you were talking
> about, was it five hundred thousand dollars or something?
> **BURTON**:   Right.  Right.
> **CAROL**:   Yeah.  I can't have that just come in and go
> straight back out again because that'll bring up all kinds of
> red alerts and that's considered a pass through transaction.
> Then, uh, the best thing is to transfer the fees UNT transfer
> the funds right straight to make the investment.  You follow
> what I'm saying?

Defendant's banker then provides advice on how to circumvent the

Patriot Act requirements and the bank's compliance department:

> **CAROL**:   Yeah.  See, cause I have a problem accessing with
> the Patriot Act and all of that.  Any, any, anything that
> comes in and goes straight out ...
> **RICE**:   Right.
> **CAROL**:   ... throws up all kinds of red alerts.  Our
> compliance department won't like and we're not, we're not
> authorized to do that cause that's a pass through
> transaction, that's the first sign of, of wrong doing
> basically.  I'm not saying that that's what you're doing but
> it, it just attracts too much attention.
> **BURTON**:   Sure.

-43-

1
     **RICE**:    Even if it's five and a quarter in and five out,
     it's still just a red flag, okay.

2
     **CAROL**:    Yeah, it's, it's, it's large sums of money.  You
     know what I mean?  It's a different situation if say you send

3
     in five and then at some point you send out one and then two

4
     here and then you know, UNT, you know what I'm saying?  Over
     a period of a few ...

5
     **RICE**:    Okay.

6
     **CAROL**:    ... weeks.
     **RICE**:    A few weeks.  Okay.

7
     **CAROL**:    But if it's a straight through, as I said, if you
     have that lump sum come in and that lump sum go out ...

8
     **RICE**:    Yeah.
     **CAROL**:    I can't help.

9
     **BURTON**:    So if, uh, I'm, I'm trying to think of,
     essentially, we form a new Antiguan entity and it's really

10
     being funded by the existing entity, so are we exporting the

11
     Antiguan entity to, uh, the existing corporation is the
     Bahamian corporation.  Are we, are we essentially changing

12
     the ...

13
        7.   <u>March 2, 2004 Call</u>

14
By March 2, 2004, defendant, Rice and Olson had decided to

15
they were going to transfer the Phoenix money from the Bahamas to

16
the British Virgin Islands to a company called "Cambria" that

17
appears to have been previously set up by defendant:

18

19
     **RICE**:    I, as far as I know.  That's, that's why I was
     calling.  I was wondering where that's at.  I've, I've done

20
     my faxes to both the Bahamas and BVI and I know they're going
     to be waiting for this document.  As soon as, as soon as we

21
     get it, I'm planning on FedExing it over to BVI.
     **BURTON**:    Uh a document…  What, what kind of a document would

22
     BVI want?
     **RICE**:    Uh, the corporation paperwork, right?

23
     **BURTON**:    No.  The way I understood it, you were gonna move
     money from uh Bahamas to BVI, and then BVI – as though it

24
     were coming from the new uh Cambria it directly into the
     Bermuda lawyer account.

25
     **RICE**:    Well I guess I need to bring you up to speed.  When

26
     I went to Genie's office filling this out, I talked to a
     banker down in Bahamas and they said, and they transferred me

27
     to an officer and the officer said there's no way you can
     just change the ownership of the account.  You just have to

28
     open up a new one.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURTON**:   Right.  We weren't gonna, we weren't gonna change ownership. We were just going to indicate the remittee.  It's still from, it's still from the Phoenix account.
**RICE**:   I thought we were gonna up a new Cambria account in the BVI jurisdiction where the money is and then just transfer the money over.  And I, I had… In, in the fax I sent him today that's what I had requested that they get me those documents to open that up.
**BURTON**:   Oh well, umm…
**RICE**:   I mean we, we can't do anything till we get this uh corporate paperwork for Cambria I think.
**BURTON**:   Well you… Well, no I, I thought what you were going to try to do is have the money, have the wire come from the Phoenix account on behalf of Cambria.
**RICE**:   Yeah, that's what I was gonna try and do.  Now I, I haven't spoken with the people at BVI and they might be more willing to do something like that, but Bahamas they're just very, very strict there.
**BURTON**:   Okay.  And, and I'm, and I'm thinking that that's the, that that's the issue, but anybody… You know when we had Carol on the line talking about the uh they didn't like an in and out?
**RICE**:   Correct.
**BURTON**:   So I am betting that any jurisdiction is gonna be similar.  They will… So, even though it's old money…
**RICE**:   Even though it's old money and it's the ownership.
**BURTON**:   And the same owner… Yeah.  They won't, they won't want to go out right away.  And so that's why uh the way I thought we were thinking of this is just uh trying to talk the banker into indicating that the remitter is uh the new, the Cambria entity because effectively Phoenix is lending the money to Cambria.
**RICE**:   Okay, well that's the conversation we have to have with BVI then.
**BURTON**:   Okay.

    8.   Early March 2004 Conversations

Because Rice was working on behalf of the FBI, and because the FBI did not wish to front $500,000 of taxpayer money in the transaction, Rice was instructed to introduce the idea of a $50,000 "test" transaction to make sure the structure created by defendant and Olson would work.  Rice did so for the first time on calls with defendant and Olson on March 8 and 9, 2004.  Because

-45-

the FBI wanted to close out the investigation, Rice was instructed to accept the "risk" of wiring $50,000 funds from Phoenix in Bermuda to Unicache's Bermuda account, as opposed to setting up a new nominee corporation in the British Virgin Islands.  After Phoenix wired Unicache's Bermuda account $50,000, Unicache's was to wire $20,000 to Rice's attorney's trust account from a separate account based in the United States.

Once this transaction went through, per the direction of the FBI, Rice told defendant and Olson that the remaining $450,000 in funds would be wired from the Phoenix account in Bermuda to the "Cambria" entity in the British Virgin Islands, and then to Unicache, with Unicache then wiring the remaining $180,000 to Rice's attorney's trust account.  This structure, because it contained an intermediate foreign jurisdiction was thought to be more secure.

Even after Rice said he was only doing $50,000, defendant tried to push him into wiring more so that he could help out Unicache which defendant evidently held some interest in:

> **BURTON**:   Well, I thought what we were gonna do…  I mean I understand your trial transaction, but is, is this gonna be a Cambria transaction?  Is that gonna show as the remitter?
> **RICE**:      I think based on that conversation you had with Beverly [Callwood of First Caribbean International Bank] that she'll let us do it that way.  We, we need to include the corporate paperwork on the Cambria thing, and she won't let us just rename the account.  We have to set up a new account so I'm filling out paperwork to set up a new account, umm, and I'm, I'm transferring all the money in the Phoenix uh certificate account into the general account, uh, to do this fifty thousand dollar transaction in the meantime and then, and then the remaining money will go immediately into the new

-46-

umm, into the, into the umm Cambria account, and this bank wire when it comes in will also go into that Cambria account. And I don't think that'll be a problem with her cuz she said she's gonna use the due diligence from when I opened this account back in '94.  She doesn't have to do that all over again.

**BURTON**:   Okay.

**RICE**:   So it, it's good that we're working with her rather than someone over in Antigua.

**BURTON**:   Sure.  Well…  But, but again what I thought we were gonna do is wire out of the existing…  Well…

**RICE**:   We are.  The fifty thousand dollar transaction is going out of the existing Phoenix Telstar account.

**BURTON**:   But I thought we were going to get fifty cuz, cuz I, I understood it that Wayne needed fifty, and then when you were thinking the uh, the other lawyer needs some money, uh… I thought there was like a hundred there, so I was…

**RICE**:   I'm just doing fifty right now.  I don't wanna risk the rest of the money considering the, the intensity of the investigation against me.

**BURTON**:   Uh-huh.

**RICE**:   I just wanna make sure that it, that it goes through cleanly.  The whole process goes through cleanly and money gets back to my attorney's trust account.  And then we'll follow-up with the, you know with the larger transaction.

**BURTON**:   Right.  So you don't want to do some direct to Unicash North America, you want…

**RICE**:   I think it's too risky.  I think it needs to go to Bermuda and then, and then do it exactly like we planned it.

**BURTON**:   Well we've had different plans so that's why I'm…

**RICE**:   Yeah I know.

**BURTON**:   …keep up.  Uh…

After defendant and Rice tried unsuccessfully to reach Beverly Callwood from First Caribbean International Bank, defendant dictated a fax to his secretary to send to Ms. Callwood.  This fax states that Rice is wiring $50,000 to Unicache's Butterfield & Sons Bermuda bank account as the "first tranche of the U.S. $500,000 to be covered by the promissory note":

**BURTON**:   So why don't I, while you look for your code list, why don't I dictate that fax to, um...
**RICE**:   Okay.  What happened to my code list, I had it here a second... oh, here it is.
(several minutes of silence)
**BURTON**:   Okay.  Did you hear that?  Were you, ah...
**RICE**:   No.  I, I just made a copy of this fax while you were doing that?  What did you tell, tell her to, to say?
**BURTON**:   Um, essentially, ah, wire instructions have been given to transfer, ah, U.S. 50,000 to the Butterfield, um, account, of that 20,000 is to be wired to the Paul S. Meyer Trust Account according to the fax coordinates included.  The remaining 30,000 is for Unicache use, ah, all 50,000 is the first tranche of the U.S. 500,000 to be covered by the promissory note.

9.   <u>March 11, 2004 Conversation and Transaction</u>

On March 11, 2004, defendant and Rice me to go over the details of the $50,000 "test" or "trial" transaction:

**BURTON**:   So, let's see where it stands, ah, if we were to wire to the, it's going to be foreign to foreign if we wire directly into the Ba, Ba, Bank of Butterfield...
**RICE**:   Unicache.
**BURTON**:   Unicache new account.  And then, then we can do a hop from there to Paul Meyer for twenty...
**RICE**:   Right.
**BURTON**:   ... and to Wayne's, ah,
**RICE**:   North American.
**BURTON**:   ...North American.
**RICE**:   That sounds good to me.
**BURTON**:   So that's the straightest way, it's, it's a, it's a very clean paper trail except for the fact that it may be Phoenix 'for the benefit of', ah, Cambria as opposed to Cambria, in, in terms of account designation.  But that doesn't matter to Unicache.

Defendant then dictates the letter with the wiring instructions to his secretary:

1

2    **BURTON:**   Um, okay, so this is the format, if you'd set it up
3    like that, and this is the same re-line except it's just
     going to be, ah, to the general account is going to be 5-1-3,
4    so....
     **RICE:**   Yeah, it's not going to have a specific account on
5    it.
     **BURTON:**   It's just going to have that account, so, so,
6    eliminate that account and, ah, so then we'll say ah, "Dear
     Miss Callwell,
7    **RICE:**   Do you want to dictate it, or....
     **BURTON:**   Yeah, yeah.
8    UF:        (UI)
     **BURTON:**   Ah, Dear Ms. Callwell, ah, please wire U.S. $50,000
9    in the above referenced, ah, account (UI)...and this
     one...ah, to the, ah, and then do the Bank of Butterfield and
10   do their coordinates.
     UF:        Mmmhmm.
11   **BURTON:**   Ah, and show if possible that in, in the wire that,
     ah, it has been done on behalf of Cambria Industries Limited.
12   Ah, um, thank you for your courtesy and cooperation, Daryl
     Rice, Cambria Industries.  Ah, do Cambria Industries Limited,
13   by Daryl Rice.
     FEMALE:    On behalf of Rice?
14   **BURTON:**   Yeah.
     FEMALE:    Okay.
15   **BURTON:**   Well, Sincerely, Cambria Industries Limited...
     FEMALE:    Oh.
16   **BURTON:**   ... by Daryl Rice in the signature block, that's
     what I mean.
17   FEMALE:    Okay.
     **RICE:**   Do you think we need to put slash Phoenix Telstar
18   because that will be on the top part, that will be on the top
     part.
19   **BURTON:**   So, what I am trying to do is....
     **RICE:**   (UI)
20   **BURTON:**   I mean, you're doing it because she knows that but
     that's what the on behalf of, ah, is.
21   **RICE:**   Okay.

22

23

24   Later that day defendant faxed the dictated wiring instructions:

25   $50,000 to Unicache's Bermuda account.  Thereafter, Unicache wired

26   $20,000 from a Nevada bank account to Paul Meyer's attorney trust

27   account, which was then transferred back to the FBI.

28

1

2

3

        9.   Defendant Pressures Rice to Wire the Remaining $450,000 to Unicache

    After the "test" transaction was successfully completed,

4

5

defendant and Olson repeatedly attempted to get Rice to wire the

6

remaining $450,000.  On March 23, 2004, defendant told Rice to

7

"proceeds with the 450 to ah the the Bermuda account, right."  On

8

April 1, 2004, defendant followed up on a voicemail left by Olson

9

on Rice's voicemail stating to Rice that "he [Olson] said that he

10

hasn't heard from you yet as to whether the uh, uh money has been

11

transferred, you know the four fifty.  The fifty is in…."

12

        10.  The FBI Emerges

13

14

    In late March of early April, 2004, the grand jury issued a

15

subpoena to Unicache that was served by the FBI.  The FBI then

16

interviewed Olson several times about the $20,000 wired to Paul

17

Meyer's attorney trust account.

18

    On April 15, 2004, Rice met with defendant one last time so

19

that they could discuss how to handle the FBI's interest in their

20

offshore banking transactions.  Rice began by telling defendant

21

that the FBI subpoenaed Paul Meyer's attorney trust account and

22

that he was on the verge of being indicted.  Defendant then

23

counseled Rice "the quicker you move the money the safer it is":

24

25

26

27

28

1

2          **RICE**:     And I think they're putting the, the screws on me
3          to plea bargain with them or something.
           **BURTON**:    Hmm.  My, my instincts says, I, I don't know, says
4          that, uh, the quicker you move the money the safer it is.
           Are you thinking the opposite?
5

6    Burton went on to suggest that Paul Meyer establish a second trust

7    account to further launder the funds:

8          **BURTON**:    So, let's assume that they know the fifty came from
           Unicache.  No, uh, well, the fifty, either way, assume,
9          assume either way.  Isn't it more likely because Unicache is
           an innocent party, why wouldn't it be better to have the
10         money out of your control and in Unicache that could wire it
           to Paul or maybe Paul should establish a new trust account to
11         wire it to.
           **RICE**:    Hmm.
12         **BURTON**:    Rather than in your name.  Because if they, if they
13         know, I mean, in, in the U. S. what you have is, you got to
           assume that it's open kimono, that it's transparent, you file
14         tax returns, you're, you got to assume they know what all the
           U. S. stuff is.  And if they're getting a lead on the other,
15         then I just think, I guess I'm just seeing it the opposite
           way of the way your seeing it.  The, the, we, sitting around
16         there it just is like a sitting target, assuming they're
           close to doing something.
17

18   After defendant and Rice discussed whether the government was

19   tapping Rice's phone, defendant again advises Rice to "get rid of

20   the money" and to do so from "Kinko's or come in here."  Defendant

21   then claims "I don't know anything" – and quickly corrects and

22   contradicts himself by saying "I know some of your stories of mail

23   fraud but I don't know anything that relates to criminal

24   activity."  He also says that he and Rice "are not conspiring or

25   anything like that":

26

27

28

                                    -51-

1

2      **RICE**:     Well, I've certainly tried to be up-front that,
3      that, you know, this, that this money is mail fraud activity
       that the government's trying to get me on.
4      **BURTON**:     But I would just ask you to think this thing
       through from the stand point I think you're safer.   My
5      instinct says with hoverings, get rid of the money.
6      **RICE**:     Mmmhmm.
       **BURTON**:     Get it out of here.   Or your control and don't do
7      it from your home machines.   Send a fax from, uh, a fax at
       Kinko's or come in here or something like that.   Um, because
8      anything that we've done I'm just counseling you on
9      international business activity.   I don't know anything.   I
       mean, I know some of your stories of mail fraud but I don't
10     know anything that relates to criminal activity.   And you and
       I are not conspiring or anything like that.   I'm just helping
11     you with international business issues.
12     **RICE**:     Mmmhmm.
       **BURTON**:     As far as I'm always been concerned, you're an
13     honest straight forward guy that's been associated with some,
       some people that maybe weren't, unbeknownst to you.   And
14     you've, you're, you're under investigation.   But under
       investigation your innocent as far as I'm concerned.

15
       Rice then says he is concerned about the government forfeiting his
16
       funds, and defendant advises him "if I were you I would not want
17
       it in some name that they might know about":
18
19     **RICE**:     That's what happened before.   They took it first.
       **BURTON**:     That's right.
20     **RICE**:     Remember the Capital Credit they just went in and
       took it all.
21     **BURTON**:     Even more reason that I would think if I were you I
       would not want it in some name that they might know about.
22
23     Defendant and Rice discuss whether to contact Beverly Callwood,
24     and if so, what phone to do it from.   Defendant says he was going
25     to call Rice before but did not "just incase your phone is
26     [tapped].   I don't want to look like a co conspirator.":

27

28

                                    -52-

1   **RICE**:     I wonder if I should not do it from her phone,
2   from, from my phone, if I have all these phone calls down
    there.
3   **BURTON**:    I, I, you know, it doesn't, its so easy to just be
    cautious.
4   **RICE**:     Mmmhmm.
    **BURTON**:    I would think with what you've heard and everything
5   like that if I were you I would be cautious.  And that's why
    I kind of blanched the other day cause Wayne had told me this
6   and I didn't want to tell you that on  your phone just in
    case your phone is.  I don't want to look like a co-
7   conspirator...

8
They then decided to call Olson from defendant's phone which they
9
evidently believed not to be tapped:
10
11  **RICE**:     Maybe we should also try calling Wayne since he's
    afraid to call me at home and see if he has any questions or,
12  see if he's...
    **BURTON**:    Yeah, we can, uh, we can do that.
13  **RICE**:     Do you think Wayne's there now or...
    **BURTON**:    I didn't get him earlier, but, uh, just as you
14  were...
    **RICE**:     Because I was going to call him but if he doesn't
15  want me to call from my home phone, we can just as well talk,
    talk on your phone.
16  **BURTON**:    Yeah.
    (dial tone) (dialing telephone) (ringing)
17  **OLSON**:    Yes.
    **BURTON**:    Hey Wayne, it's Tom and Darryl here.
18  **OLSON**:    Hi.
    **RICE**:     Hi.
19  **BURTON**:    We're, uh, he and I are just kind of talking about
    things in general and, uh, wondering if there's any updates
20  that, uh, you would like us for.
21
Olson and Rice, with defendant on phone, agree that making calls
22
from Rice's house was not a good idea:
23
24  **RICE**:     I'm just thinking that, that maybe the government's
    looking at my phone records and, uh, seeing all these calls
25  I've been making to Antigua, and Bahamas, and BVI, and then
    he sees, and then they, then they see phone calls to you all
26  the time.
    **OLSON**:    I don't know, I mean, I just was, I would think
27  that you wouldn't want to be making those from your home
    anyway, regardless.
28
                              -53-

1    **RICE**:      Well, maybe I made a mistake doing that, um, I
     had...
2    **OLSON**:      I think, I thought that's what you were up, I, I
     just assumed, I shouldn't assume anything, I thought that's
3    what you were doing from Tom's office, those things from
     Tom's office.
4

5    Olson then shares his philosophy on avoiding wiretaps with

6    defendant and Rice:

7    **OLSON**:      I do business by my, you know, in, in an office
     with nobody else there and I make and I go to phones that
8    are, that I know, are, you know, I'm not worried, they've got
     to let me know why, they don't need to know you are going if
9    they're going to put a tap or something like that on your
     wire, you know, on your phone.
10   **RICE**:      Mmmhmm.
11   **OLSON**:      But I would say I do because I do a lot of business
     in the, in foreign countries and some of which pop up.  You
12   know, I, I was in Antigua for a long time and Antigua, you
     know, a long, four or five years ago, as Tom knows, you know,
13   all of a sudden the government showed up down there
     determined that they were going to get everybody that did
14   business in Antigua whether for whatever reason and the
     government, of course, failed.  But that, the point is I have
15   always taken the precaution that, you know, the government's
     trying to figure out if your not doing business in the United
16   States, you know, for some reason you're a criminal.
17

18   Olson goes onto tell Rice to make his calls from defendant's

19   office because of the attorney-client privilege:

20   **BURTON**:      Okay.
21   **OLSON**:      ...yeah, I think you got, what I would do is if
     you're going to do anything I would to do it from Tom's
22   office.
     **RICE**:      Ah-huh.
23   **OLSON**:      Because as counsel, they can't, you know, he's got,
     he's got added protection that you and I would never have...
24   **RICE**:      Ah-huh.
25   **OLSON**:      ...because he's a lawyer.
     **RICE**:      Okay.[6]
26

27   _____

28        [6]It is unclear if defendant was paying attention during this
     portion as it appears from the recording he is on a separate call.

Rice and Olson speak for a while longer about a number of topics,

including getting their stories straight with for the FBI, who

Olson informs defendant and Rice have already contacted him.

Olson and Rice then end the call and Rice and defendant continue

the meeting in his office:

> **BURTON**:   But again, you're, um, with Unicache being Bermuda
> with it being from a, from whether its Phoenix Cambria or
> whatever, BVI to Bermuda, that's all foreign.  No, no
> connection, so.  Are you at the toll booth already?  You're
> way too early.  I'm still with a client, uh...

After discussing hiring a criminal and a forfeiture lawyer,

defendant again advised Rice to get rid of the money "move it.

Get it to somewhere else that's not in your name of control" as

they planned:

> **BURTON**:   So, um, but, my inclination and it sounds like
> that's what Wayne was saying, too, is move it.  Get it out to
> somewhere else that's not in your name or control.
> **RICE**:      I...
> **BURTON**:   That's exactly what this transaction, or you know,
> the, the two hundred thousand, three hundred thousand split
> was oriented towards.

As the meeting concluded down, Rice agreed to keep defendant in

the loop.  Defendant counseled Rice about keeping "a phone

sensitivity" and to not to "use names" and to use "code words":

> **RICE**:      I'll make some calls and keep you posted.  Are you
> around tomorrow or not.
> **BURTON**:   Uh, I have, I'm around here with a breakfast and
> another meeting and then I head to Del Mar for a retreat type
> stuff.  But I think that, um, a similar, uh, sensitivity, a
> phone sensitivity...
> **RICE**:      Yeah.
> **BURTON**:   Not saying on your home or cell phone that's, um..
> **RICE**:      I'll use a friend's phone.
> **BURTON**:   Don't use names.
> **RICE**:      Yeah.

-55-

```
BURTON:    Don't use names.
RICE:      Yeah.
BURTON:    You know, be, be a little bit, uh, more cautious.
RICE:      I'll use some, some code words.
BURTON:    Yeah, yeah.  (UI)
RICE:      Okay.
BURTON:    Okeydokey.
RICE:      Alright.  Thank you.
BURTON:    Good enough.  I'm going to get you cleared out of
here and um, (UI).
UF:        Okay.  There you go.
RICE:      Thank you.  See you later.
UF:        Your welcome.
RICE:      Adios.
(door closes)
```

## III. GOVERNMENT'S SENTENCING POSITION

A.   PSR's Calculations

The Probation Officer's pre-sentence report ("PSR")
calculates defendant's offense level to be 15, based on defendant
laundering $50,000:

```
Base offense level  =    8 [2S1.1(a)(2)]

Laundered amount
$50,000             =    6 [2B1.1(b)(1)(D)]

Conviction under
§ 1956(a)(2)        =    2 [2S1.1(b)(2)]

Sophisticated
Laundering          =    2 [2S1.1(b)(3)]

Acceptance of
Responsibility      =   -3 [3E1.1]

TOTAL OFFENSE LEVEL =   15 [18-24 months]
```

The government agrees with the PSR's calculations except in
three areas.  First, Probation miscalculated the amount of funds
laundered based on a mistake of law.  Second, Probation appears to
have inadvertently omitted an enhancement based on defendant's use

of a special skill and abuse of a position of trust to carry out

the offense.   Third, defendant's instructions to Rice at their

last meeting, including his instruction to "get it [the laundered

funds] out to somewhere else that's not in your name or control,"

warrant a two-level enhancement for obstruction of justice.

### 1.   The Amount Laundered is $500,000

In determining the amount laundered in a money laundering

sting, the metric is not how much "flash" money was used during

but how much defendant agreed to, and intended to, launder.   See

United States v. Barton, 32 F.3d 61, 65 (4th Cir. 1994) (When

defendant "intended to launder $500,000 and accepted the briefcase

believing it contained that amount . . . the district court's

finding . . . three-level enhancement under § 2S1.1(b)(2) was

appropriate."); United States v. Richardson, 925 F.2d 112, 116

(5th Cir. 1991) (Guidelines should include all the money defendant

intended to launder).   Here, defendant stipulated in the factual

basis of plea agreement to laundering $500,000: "The agreement

between Rice and defendant was for Mr. Rice to wire $500,000 of

proceeds of his mail fraud to UniCache's off -shore account."   .

Plea Agreement ¶ 9.   Therefore, as a matter of law, the amount of

laundered funds for the purpose of the guideline calculation is

the $500,000 defendant stipulated that he agreed to launder, not

the $50,000 in "flash" money provided by the FBI.[7]

_____

    [7] In addition to agreeing that the $500,000 is amount
defendant agreed to launder, it is clear from the tapes that this

-57-

1          2.    <u>Defendant Used His Legal Skills To Carry Out the
2                Offense</u>

3        Defendant clearly used a "special skill" and abused a

4   "position of trust" – his training and status as an attorney – to

5   commit the crime.  The commentary of U.S.S.G. § 3B1.3 states that

6   a "special skill refers to a skill not possessed by members of the

7   general public and usually requiring substantial education,

8   training, or licensing.  Examples would include pilots, <u>lawyers</u>,

9   accounts, chemists, and demolition experts." (emphasis added).  It

10  is clear from the recordings that defendant used his special

11  skills as an attorney to create false "legal" documents including

12  the phony paper trail to make it appear as though the payment from

13  Unicache to defendant's attorney trust account was legitimate; the

14  "nominee" agreement that defendant offered to create to eliminate

15  any connection between Phoenix and Rice; and "Cambria" and the

16  other shell corporation designed be defendant to "wink" away

17  Phoenix.

18       Defendant also abused a position of trust.  The guidelines

19  contemplate that individuals who abuse their positions of trust to

20  facilitate the commission or concealment of a crime "generally are

21  viewed as more culpable."  <u>Id.</u>, comment. (backg'd).

_____

(continued…)

is the correct amount as well.  Indeed, after the $50,000 test
transaction defendant repeatedly attempted to get Rice to launder
the remaining $450,000.

-58-

Here, defendant held a position of public trust as a member of the California State Bar.  See United States v. Goldman, 447 F.3d 1094, 1095 (8th Cir. 2006) ("A defendant acting in his capacity as an attorney occupies a position of public trust."); United States v. Hemmingson, 157 F.3d 347, 360 (5th Cir. 1998) ("[A]ttorneys by definition occupy a position of public trust."); United States v. Harrington, 114 F.3d 517, 519 (5th Cir. 1997) ("[I]t cannot be gainsaid that lawyers occupy a position of public trust.  It would be rank folly to suggest otherwise.").  The only issue, therefore, is whether defendant abused that position in a manner that significantly facilitated either the commission or the concealment of his offense.  The government respectfully submits that both are satisfied here.

This is not a case of a defendant who committed a crime and who coincidentally happened to be an attorney.  To the contrary, this case involves a defendant whose criminal activities were directly intertwined with and inextricable from his work as an attorney.  Defendant used his skills as an attorney to create a false paper trail making it appear that the funds received by Rice were payment for services rendered to Unicache, as opposed to laundered proceeds of mail fraud.  In addition, defendant offered his special skills as an attorney to create "nominee" agreements to assist defendant in concealing his assets.  Thus, defendant's position of trust not only "significantly facilitated" the

commission of his offense: the offense would never have occurred but for that position.

Moreover, even without knowing that Rice was recording their conversations, defendant was undoubtedly emboldened in his criminal dealings with Rice and Olson by the belief that he could protect those communications from disclosure by invoking the attorney-client privilege.  Co-conspirator Olson makes this clear, advising Rice to only call him from defendant's office phone.

An attorney holds a position of trust in the community, and an attorney who abuses that position to further a criminal conspiracy is viewed under the Guidelines as more culpable than an individual who does not hold such a position.  Because defendant's status as an attorney was integral to his ability to commit and to conceal his criminal conduct, the two-level adjustment under § 3B1.3 is warranted.  See United States v. Franklin, 837 F. Supp. 916, 920 (N.D. Ill. 1993) ("By conspiring to obstruct the very judicial process that he had sworn to defend, [the attorney-defendant] abused his position of public trust . . . .").

### 3.    Defendant Attempted To Obstruct Justice

A two level enhancement for obstruction of justice under §3C1.1 is appropriate if the defendant "attempted to obstruct of impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offence of conviction."  Examples of conduct this enhancement is meant to deter in the application notes include the attempt at "shredding a

-60-

document or destroying ledgers upon learning that an official
investigation has commenced or is about to commence."

     After Rice told defendant that the FBI subpoenaed his
attorney's trust account and Olson told defendant that the FBI
questioned him about the laundering, defendant repeatedly told
Rice to destroy evidence of the crime:

- **RICE**:    And I think they're putting the, the screws on
  me to plea bargain with them or something.
  **BURTON**:    Hmm.  My, my instincts says, I, I don't know,
  says that, uh, the quicker you move the money the safer
  it is.

- **BURTON**:    Get it [the money] out of here.  Or your
  control and don't do it from your home machines.  Send a
  fax from, uh, a fax at Kinko's or come in here or
  something like that.  Um, because anything that we've
  done I'm just counseling you on international business
  activity.  I don't know anything.  I mean, I know some
  of your stories of mail fraud but I don't know anything
  that relates to criminal activity.  And you and I are
  not conspiring or anything like that.  I'm just helping
  you with international business issues.

- **RICE**:    That's what happened before.  They took it
  first.
  **BURTON**:    That's right.
  **RICE**:    Remember the Capital Credit they just went in
  and took it all.
  **BURTON**:    Even more reason that I would think if I were
  you I would not want it in some name that they might
  know about.

- **BURTON**:    So, um, but, my inclination and it sounds like
  that's what Wayne was saying, too, is move it.  Get it
  out to somewhere else that's not in your name or
  control.
  **RICE**:       I...

1    **BURTON**:   That's exactly what this transaction, or you
2    know, the, the two hundred thousand, three hundred
     thousand split was oriented towards.

3

4    • **RICE**:      I'll make some calls and keep you posted.  Are
     you around tomorrow or not.
5    **BURTON**:   Uh, I have, I'm around here with a breakfast
     and another meeting and then I head to Del Mar for a
6    retreat type stuff.  But I think that, um, a similar,
     uh, sensitivity, a phone sensitivity...
7    **RICE**:     Yeah.
8    **BURTON**:   Not saying on your home or cell phone that's,
     um..
9    **RICE**:     I'll use a friend's phone.
     **BURTON**:   Don't use names.
10   **RICE**:     Yeah.
     **BURTON**:   Don't use names.
11   **RICE**:     Yeah.
     **BURTON**:   You know, be, be a little bit, uh, more
12   cautious.
     **RICE**:     I'll use some, some code words.
13   **BURTON**:   Yeah, yeah.  (UI)
     **RICE**:     Okay.
14   **BURTON**:   Okeydokey.

15

16

17   Defendant counseled Rice to destroy evidence after he knew

18   there was an official investigation.  As Rice's attorney,

19   defendant no doubt expected Rice to follow his advice.

20   Accordingly, a two-level enhancement is appropriate for

21   obstruction of justice.

22              4.   The Government's Guideline Calculation

23       With the changes discussed above, the following is the

24   correct advisory guideline calculation is as follows:

25   Base offense level  =    8 [2S1.1(a)(2)]

26

27   Laundered amount
     < $400,000          =    14 [2B1.1(b)(1)(G)]

28

```
Conviction under
§ 1956(a)(2)           =     2 [2S1.1(b)(2)]

Sophisticated
Laundering             =     2 [2S1.1(b)(3)]

Use of a
Special Skill          =     2 [3B1.3]

Obstruction of
Justice                =     2 [3C1.1]

Acceptance of
Responsibility         =    -3 [3E1.1]

TOTAL OFFENSE LEVEL =       27 [70-87 months]
```

Pursuant to the plea agreement, the government is obligated to recommend a sentence of 70-months imprisonment and a fine corresponding to an offense level of 27.

B.   Appropriate Sentence Under § 3553(a)

An analysis of the factors set forth in 18 U.S.C. § 3553(a) also militate in favor significant sentence consistent with the advisory guidelines.  Under these factors, a sentence should:

(1)  Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(2)  Afford adequate deterrence to criminal conduct; and

(3)  Protect the public from further crimes of the defendant; and

(4)  Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

-63-

The sentence also needs to take into consideration the history and characteristics of the defendant; avoid unwanted sentencing disparities; and provide restitution.  The government will address these factors as in response to defendant's and probation's sentencing argument below.

        1.   <u>There Is a Vital Need Here For the Sentence To Promote Respect For The Law</u>

The first § 3553(a) requires the sentence to "reflect the seriousness of the offense" and to "promote respect for the law" as well providing for a "just punishment."  Of these three factors, there can be no disagreement that international money laundering is grave offense.  The seriousness of the offense is reflected by the fact Congress has imposed a 20-year statutory maximum and the sentencing guidelines provide enhancements based on the fact the laundering is international.  The seriousness of this offense, in a post 9-11 world is obvious, and reflected by the added checks on international laundering imposed by the Patriot Act and studiously circumvented by defendant.

In this case the need to "promote respect for the law" is difficult to overstate.  As an attorney, defendant occupied a special position of trust in society that shelters much of his activities from discovery by the government absent extraordinary measures.  This is not a situation where defendant engaged in some kind of crime and he also happens to be an attorney, here defendant's crimes were undertaken as part of his legal practice.

Rice approached defendant as an attorney and presented him with a problem of how to repatriate his funds that were the proceeds of mail fraud.  As an attorney, defendant was obligated to counsel Rice to follow the law.  Instead, defendant not only failed to promote respect for the law provide responsible advice, it appears from the recordings defendant <u>invented</u> a structure designed to make it improbable that Rice's illegal proceeds would ever be detected.  Rice, repeatedly, make it undeniably clear that he was attempting to repatriate illegal proceeds of his mail fraud activities without being detected.  Defendant stated he understood that these were illegal proceeds and then proceeded to help Rice get them into the country without detection.  Defendant offered to supply "nominees" to make it appear as though Rice didn't control the funds:

> **BURTON**:   Um, I could supply, I've got two different entities that I'm the only one that kind of controls that are old and seasoned and, uh, out of Hong Kong and uh, you know, just put it in the name of, um, let me see if I can even remember the names.  Ultimate Capital Company or Telesis Capital Company and one or the other of those would be the um, the um, nominee for Phoenix and we would have a nominee agreement.  We, I gave you a form of a nominee agreement and, um, you know, just.[8]

Attorneys are provided special privileges because they are entrusted with promoting respect for the law by counseling their clients to follow it.  The fact that defendant, as an attorney,

---

[8] Defendant argues that the behavior documented in the conversations was aberrant.  He does not explain why if this was an aberration he is offering to "supply" "two different entities" he already had created as nominees as well as "a form nominee agreement."

not only abdicated his obligations to promote respect for the law but actually created a structure that broke the law in a manner that was designed to be all but impossible to detect is as dangerous as it is disturbing.

2.   The Sentence Imposed Needs Deter Other Attorneys

The second § 3553(a) factor requires the sentence "afford adequate deterrence to criminal conduct."  The overwhelming majority of white collar law enforcement is not undertaken by the FBI, the IRS, or the SEC.  Most of this law enforcement takes places in the tens of thousands of law offices across the country when clients sit down with their attorneys to learn what they can, and cannot, do.  Communications with these attorneys is privileged precisely so the people seeking legal advice are free to tell their attorneys everything without fear it will be discovered by the government or others.  The system only works when attorneys attempt to advise their clients about what the law permits and counsel to the follow it.  When, as here, attorneys counsel their clients to break the law and assist them in covering their tracks, it turns rationale for the attorney-client privilege on its head.  Instead of the communications being privileged to promote law abidingness, defendant here used that privilege to promote criminality knowing that the privilege makes the chance of apprehension more remote.

It is both unreasonable, and undesirable, to have the government routinely invade the sanctuary of attorney-client communications to determine if the law is being broken.  To avoid this outcome, defendant's sentence should provide an adequate deterrence so that attorneys who are considering crossing the line do not do so for fear of serious consequences.

3.   There is a Need To Protect The Public From Whatever Laundering Structures Defendant Put Into Place

Defendant has taken the position that the government caught him the only time in his 30-year practice as an "asset protection" attorney he laundered money.  This claim is, of course, belied by the fact the government targeted defendant because two individuals who pleaded guilty to mail fraud identified defendant as someone who offered to launder their funds.  It is also belied by the grace and ease with which defendant created and executed a structure for Rice to launder his proceeds.  It is belied by the fact that defendant had "nominee" agreements and corporations ready to go to assist Rice in concealing the source of his funds. And is belied by defendants numerous conversations with Rice debating which jurisdiction would allow defendant the best chances to avoid detection by the United States.  And when defendant called one of his crooked Caribbean bankers (who advised him how not to raise flags with the bank's compliance department) it was clear from the conversation defendant had at least one other transaction underway:

-67-

1   **CAROL**:      Okay.
2   **BURTON**:     Okey doke.
    **CAROL**:      No problem, and Tom, and I sent you an other email
3   on the matter we discussed previously so you can just have a
    look at that.

4
5   Defendant was asked by the government to come in and identify
6   the other "clients" whose money laundering services were offered.
7   Defendant refused to do so.  Because defendant's files are
8   presumptively subject to the attorney-client privilege the
9   government has no way of knowing how many other clients that
10  defendant has laundered money for.[9]

11  It is government's hope that after defendant is sentenced to
12  a lengthy custodial sentence he will change his mind and provide
13  the government with sufficient information to investigate
14  defendant's other money-laundering clients under the crime fraud
15  exception.  A custodial sentence is therefore appropriate to
16  ensure that the laundering structures created by defendant are not
17  allowed to persist.[10]

18
19  _____
20      [9] Defendant submitted a letter from the attorney who
    purchased his practice in support of his claim that the Rice
21  laundering was unique.  Neither this attorney, nor the government,
    has any way of knowing if he received all defendant's client
22  files.  Presumably, defendant would not release files that would
    incriminate him to an outsider <u>after</u> he was apprehended by the
23  government.  Indeed, as is discussed above, when defendant learned
    the FBI was investigating, he counseled Rice to destroy evidence
24  of the laundering.  Presumably defendant followed his own advice
    with respect to his files.
25
26      [10] Defendant asks this Court to reduce his sentence based on
    his offer to provide substantial assistance.  Defendant recorded
27  the chairman of the board of company the government was
    investigating that he happened to be a board member of – totally
28  unrelated to this matter.  These recordings proved useless and
    resulted in nothing.  When defendant agreed to make these

                              -68-

C.   Defendant's and Probation's Arguments

    1.   Loss of Defendant's Legal License and Status Is Not Punishment[11]

In support of the recommendation of a probationary sentence, the probation relies on defendant's "personal characteristics" and the "collateral consequences" he will face as a result of his conviction.  The probation officer has made similar arguments with respect to other attorneys convicted of crimes.

The only collateral consequence defendant faces that are different from any other defendant is the loss of his law license and practice.  Defendant is losing his law license because he betrayed the principles he was obliged to uphold.  Suspension or disbarment from the State Bar is automatic upon a felony conviction involving moral turpitude: were that to constitute a mitigating "collateral consequence," convicted attorneys would never go to prison (or would, at a minimum, always serve reduced

---

(continued...)

recordings it was with the understanding that the FBI would not ask him <u>any</u> questions about this case.  For defendant to claim "substantial assistance" he would need, at the very least, to come clean with the government about his 30-year "asset protection" career and assist the government in uncovering the other laundering activities.

[11] Defendant also requests a variance based on his "age and medical conditions."  According to the PSR, defendant appears to be in outstanding health.  PSR ¶¶ 71-72.  As for defendant's age, he is 62 years old.  It is unclear to the government what basis for a variance exists based on these factors.

-69-

sentences).[1]   In this regard, the government asks the Court to

consider the following cogent analysis of another district court

that sentenced a 64-year-old rabbi (defendant is 62) to prison for

tax evasion, rejecting his claim that he should not be

incarcerated because he had been "punished enough":

> If punishment were wholly or mainly retributive, [public
> humiliation] might be a weighty factor.  In the end,
> however, it must be a matter of little or no force.
> Defendant's notoriety should not in the last analysis
> serve to lighten, any more than it may be permitted to
> aggravate, his sentence.  The fact that he has been
> pilloried by journalists is essentially a consequence of
> the prestige and privileges he enjoyed before he was
> exposed as a wrongdoer.  The long fall from grace was
> possible only because of the height he had reached.  The
> suffering from loss of public esteem reflects a body of
> opinion that the esteem had been, in at least some
> measure, wrongly bestowed and enjoyed.  It is not
> possible to justify the notion that this mode of
> nonjudicial punishment should be an occasion for
> lenience not given to a defendant who never basked in
> such an admiring light at all.  The quest for both the
> appearance and the substance of equal justice prompts
> the court to discount the thought that the public
> humiliation serves the function of imprisonment.

United States v. Bergman, 416 F. Supp. 496, 502-03 (S.D.N.Y.

1976).  With respect to the Probation Officer's consideration of

"collateral consequences," the government strongly disputes that

defendant should receive a benefit over other citizens who commit

the same crime simply by virtue of the fact that he led a life of

privilege at the time he chose to become a criminal.

Recently, Judge Fischer in United States v. Terry

Christensen, SA 05-1046(E)-DSF, addressed the identical argument

made by the probation office and defendant:

---

[1]   The government notes that all gainfully employed criminals
lose their ability to work while incarcerated, and many lose
licenses and are permanently barred from their chosen professions.

Many [of defendant's] friends conclude that loss of his
license, his firm, his reputation, and his career are
sufficient punishment and that a period of home confinement
and perhaps community service are an appropriate sentence.  I
disagree.  Most criminals lose their jobs and livelihood and
the respect of people who believe they knew them.  These
things are a natural consequence of Mr. Christensen's
deliberate conduct.  They are not punishment and certainly
not sufficient punishment.

I agree with the eloquent comments of my colleague in the
Southern District of New York that it is not possible to
justify the notion that public humiliation and other forms of
non-judicial punishment should be an occasion for lenience
not given to a defendant who has never had the opportunity to
reach the same heights in the community. Sadly, doctors,
accountants, corporate officers, lawyers, and other
participants in the justice system appear in our courts with
increasing frequency. Most are appearing for the first time
and have had opportunities and background similar to those of
Mr. Christensen. The concept of equal justice requires that
the Court give little weight to this particular defendant's
personal and professional accomplishments and the somewhat
unique collateral consequences his own conduct has caused.

11/24/2008 RT at 56-57 (Stolper Decl. Ex. C).[12]

## 2.   Defendant's Conduct Is Not Aberrant

The probation officer concludes, on the basis of a four-

question polygraph examination, that the government caught

---

[12] The probation officer who prepared defendant's PSR also
recommended probation for Terry Christensen.  Judge Fischer
described this recommendation as "simply ludicrous":

I have also considered the kinds of sentences available and
recognized that I have the legal authority to sentence Mr.
Christensen to probation, home detention, or community
confinement. However, an analysis of the 3553(a)factors and
an individualized assessment here establishes that the
probation officer's recommendation is simply ludicrous.

11/24/2008 RT at 58 (Stolper Decl. Ex. C).

-71-

defendant the first time in his 30-year "asset protection" career
that he laundered funds.

First, it is important to note that defendant has steadfastly
refused to discuss the offence conduct with the government and
evidently declined to discuss it with the probation officer.  PSR
¶ 8.[13]  Defendant's claims that this is aberrant conduct are based
on the statements of his attorney (who is obviously not going to
take the position that defendant laundered money before) and a
polygraph examination report.  Defendant's polygraph exam was
administered and reviewed by examiners paid undisclosed amounts by
defendant.  Defendant did not submit to a government polygraph.
It is unclear if defendant was examined by other polygraphists
that are undisclosed as attorney work product.  There is no
recording, video, or other memorializaton of the polygraph test.
It is unclear if defendant had a "dry run" to try out his answers.
While the court may consider the polygraph evidence post-<u>Booker</u>,
the government respectfully requests it not place any weight on
it, especially in light of the hundreds of pages of transcripts

_____

[13] Obviously, defendant is free to decline to say anything
under the 5th Amendment.  But here defendant is making an
affirmative claim, though his lawyer, that he has never laundered
money before.  The government is entitled to challenge this claim.
The most obvious way the government would challenge this claim
would be ask defendant how he knew who to call at the various
Caribbean banks he was dealing with; what a "wink" trust is;
etcetera.  Because defendant has not made a claim that this
conduct is aberrant but has refused to allow any challenge to it,
the Court should reject the self-serving claim.

evidencing defendant's experience, resolve, and remorseless in laundering funds and then trying to cover it up.

The government targeted defendant after <u>two</u> separate cooperators, Rice and Easton, independently told the government that defendant laundered funds using so-called "wink" trusts. Based on this information, defendant asked Rice to back up his proffer statements and confirm that defendant was, in fact, laundering funds. And defendant did just that. If defendant's and probation's arguments are to be believed, Rice and Easton independently made up their claim that defendant was laundering money and then, evidently, lucked out because when Rice asked defendant to launder funds he decided, for the first time, to do it. Defendant's claim of aberrant behavior should be rejected.[14]

Finally, defendant's conduct on tape demonstrates that laundering is no aberration. Defendant is recorded discussing the pros and cons of various jurisdictions based on whether the United States government can access them. Just a small sampling of defendant's conversation demonstrates he knows how move money around without the United States detecting it:

> • **BURTON**:   And, that, they have the potentiality, we don't know whether it's real or not. We do know over a 5 percent is real in terms of Bermuda Monetary Authority. But the, they supposedly, or they theoretically do diligence on just about any entity so they will, so the advantage that Phoenix has is that it's ten years old and it's probably not on any lists or anything like that and, ah, so reporting it that way as

---

[14] Unanswered in defendant's over 350-pages of submissions is why he decided to launder funds this time. Even aberrations have explanation and defendant offers none.

-73-

opposed to taking a new entity name then they're going
to ask whose the owner of it, they're going to, they,
they drill down, they get, get to that level of
granularity in terms of knowing your customer rules.
Plus, to really protect you, so in other words I guess
what I think that I'm saying is from the safety stand
point of Unicache, ah, doing it exactly the way it is is
the best, is the best way because...
**RICE**:     I'm just afraid that Phoenix Telstar might be
on some list and if the source of funds for the new
entity came from a foreign source that would, you know,
rather than a U.S. source, that would, ah, be an extra
buffer.
**BURTON**:     Well, but if, but you see if, if they ask, if
what, whoever, wherever it is that we would go to do a
new entity asks, they, they...  It's, there's still
going to be a Phoenix, ah, trail to whatever the new
entity may be.  I'm not saying don't.
**RICE**:     Right.  It would just be foreign to foreign.
That's all.
**BURTON**:     Yeah, yeah.

- **BURTON**:     And, uh, we're just, Daryl just got here.  He
was running a little late so I thought we'd, we'd do
that first.  I did get the two documents so we'll work
on being ready on those and then do our, our other
stuff.  Uh, just, uh, Daryl, for your sake, uh, I, I
told Carol that we are interested in moving some money
from the two existing accounts, that are old accounts
with this, uh, uh, the old corporation, uh, as soon as
possible.  Until she knows the name and knows that we,
via fax, that documents are headed her way, she can't
get the corporation UNT.  She can assign a corporate
number to it as soon as she knows things are on her way
and what name it is.  So once we have the number, then
we can work on the wire.  You can, you would probably
give me a fax or an email with the specific wire
instructions.
**CAROL**:     Yes, definitely.
**BURTON**:     But, uh, then we can get the wires going.  As
I mentioned to you Carol, the existing company has
accounts in -- is it BVI in the Bahamas, I think?
**RICE**:     Correct.

- **BURTON**:     So if, uh, I'm, I'm trying to think of,
essentially, we form a new Antiguan entity and it's
really being funded by the existing entity, so are we
exporting the Antiguan entity to, uh, the existing

-74-

corporation is the Bahamian corporation.  Are we, are we essentially changing the ...

- **BURTON**:   Something, you know, that's, that's what all those things are.  And even if we do a nominee agreement that says that somebody else really owns it, there's no, there's no trail.  The money, the money has been there for what, 5 years, 6 years, whatever, whatever it is...

    **RICE**:    The account was opened up in 94

- **BURTON**:   ...because of the, UNICACHE is just, it's a hands down.  I just don't know anything like it that ca n meet your potential requirements if you're not there and you want to way of getting, of getting money to Cheryl [Rice's wife], well the cards are a perfect way. I mean there's, you know, it, it takes, uh, a friend-, it's not, if, if, if you had no relationship with the company you couldn't do it, but you know, it takes with a friendly understanding of what the deal is, it's, it's easy to get Cheryl a different card every time the one gets close to $10,000, it's, you know, it's easy enough to do that when you're (UI)

- **BURTON**:   Well, I think you know all there is know about it, I mean, other than, you know, real specifics of talking with Wayne, you've been thinking about it for a long time and you've read the materials.  I know you know about it.  I think it's really just a question of whether you want to do it or not.  And in your, in your bigger picture context with these walls and things, I, I don't know of any way, I wish I could think of, of some way to make Phoenix disappear but what's the basis.  See it's too old and seasoned

And if these statements were insufficient, it is clear when

defendant is speaking to one of his Caribbean bankers that as has

at least one other transaction underway:

    **CAROL**:    No problem, and Tom, and I sent you another email on the matter we discussed previously so you can just have a look at that.

Defendant's ease in laundering Rice's funds can only be explained by the fact that defendant had long experience in such matters.[15]

---

[15] Defendant also argues that he did not launder Rice's funds for profit.  According to the PSR, defendant had invested $800,000

-75-

3.    Defendant's Charitable Works And Support Letters Do
      Support a Low-End Advisory Guideline Sentence

Defendant includes of 100 letters in support of his good character.  Tellingly, the letter defendant wrote soliciting the support letters is misleading.  Defendant tells his friends that in exchange for his laundering services he billed Rice "by the hour just as I had done over the years for ordinary business and estate planning work."  Exhibit 2 of Defendant's Attachments. This is false.  Defendant billed Rice by hour – but he also held a substantial interest in Unicache and appears to have stood receive some portion of the $300,000 "investment" Rice was making in Unicache in exchange for it laundering $200,000 back to his criminal defense attorneys.  Second, defendant fails to tell his friends writing letters in support that in addition to laundering money, after he learned he was under investigation he counseled Rice to get rid of the evidence.  Third, defendant, inexplicably, told his friends that he could "receive as much as three years incarceration."  Obviously, both the statutory maximum and the advisory sentencing guidelines call for a much greater sentence. Defendant appears to be understating the seriousness of his crime to the individuals he is soliciting support letters from.

In the end, defendant launders money.  This activity is inconsistent with the person described in the hundred plus letters

_____

(continued...)

in Unicache and appeared to be in a position to benefit if Rice invested in Unicache.  The probation officer concluded – as should the Court- that defendant's motivation here was financial gain. Indeed, there is no other possible motivation suggested in defendant's massive sentencing filings.

-76-

submitted in support.  Based on the tapes and defendant's guilty

plea we know that he launders funds – and does so without pause.

The comments of Judge Fischer with respect to the luminaries who

wrote in support of Mr. Christensen are insightful and applicable:

> The probation officer was apparently swayed by the many
> letters from impressive people who attested to defendant's
> ethics and integrity. I am not swayed. Integrity is
> determined by what one does when no one is watching. When no
> one was watching, other than his co-conspirator, Mr.
> Christensen's lack of integrity was shockingly and
> disturbingly apparent. A first year law student knows enough
> not to do the things Mr. Christensen did here. But as the
> Government notes and defendant's own words and demeanor on
> the recordings establish, his actions were brazen and were
> engaged in with great glee and without hesitation.

11/24/2008 RT at 59 (Stolper Decl. Ex. C).

The probation officer and defendant also rely heavily on

defendant's charitable words as a basis to mitigate defendant's

sentence down to probation.  It is impossible to reconcile

defendant's charitable works with his illegal money-laundering

activities.[16]  One has to wonder how much defendant used his

charitable works, like his law license, to obscure the truth

surrounding his illegal activities.  Regardless, charitable works

are from an attorney are not unusual and should not serve to

excuse defendant's crimes.  Judge Fischer:

---

[16] The probation officer found that over the last 9 years
defendant has spent 57% of his time on charitable works.  It
appears that defendant himself is the source of this information.
Presumably, defendant did not keep billing records that state how
much time he spent laundering funds.

-77-

That he is kind to employees, loves his family, makes
charitable contributions, and served in the military are
laudable attributes but not so different from hundreds of
partners in well-respected firms and not so extraordinary as
to justify a departure or variance. There is no question that
Mr. Christensen's incarceration will have an impact on his
family. He has a loving wife and children who will miss him.
But his family is far more fortunate than most wives and
children of the many thousands of felons that are sentenced
to prison every year. Many of these families have difficulty
making ends meet, even while the breadwinner is not
incarcerated. Loss of a father, husband, or son often is
financially devastating as well. In many cases, the
defendants are not around to see their children grow up and
to help raise them. It happens here almost any Monday. The
Christensen family will be well off, though Mr. Christensen
is in prison.

## IV.   CONCLUSION

Defendant should be sentenced to 70-months.  The government
respectfully requests that the Court impose a fine consistent with
the guideline calculations provided by the government.[17]

February 2, 2009              Respectfully submitted,

                              THOMAS P. O'BRIEN
                              United States Attorney

                              /S/
                              _____
                              Andrew Stolper
                              Assistant United States Attorneys

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

---

[17] Given the tapes, the government has no confidence that the
financial disclosures provided by defendant are correct.
Similarly, the letter defendant submitted from Unicache setting
forth its financial condition is difficult to credit given that
Unicache was perfectly willing to launder funds for Rice for
$300,000 investment.

-78-

1

2                          **DECLARATION OF ANDREW STOLPER**

3

4    I, Andrew Stolper, declare as follows:

5        1.   I am an Assistant United States Attorney assigned to

6    United States v. Thomas Burton, SA CR 08-17-JVS.

7        2.   The quotes from Mr. Burton that appear in the

8    government's sentencing position were taken from transcripts the

9    FBI prepared from recordings secretly made while investigating Mr.

10   Burton.

11

12       3.   Attached as Exhibit A to this declaration is an

13   interview report of Michael Easton.

14       4.   Attached as Exhibit B to this declaration is an

15   interview report of Daryl Rice.

16       5.   Attached as exhibit C to this declaration is the

17   transcript of the sentencing hearing in United States v. Terry

18   Christensen, SA 05-1046(E)-DSF.

19

20       I swear the foregoing is true and correct to best of my

21   knowledge:

22

23                                   _/S/ *Andrew Stolper*_
                                     ANDREW STOLPER

24

25

26

27

28

                                    -79-